892 P.2d 246 (1995)
In the Matter of the CUSTODY OF C.C.R.S., a Child. and concerning
C.R.S., Petitioner,
v.
T.A.M. and M.A.M., Respondents.
No. 94SC23.
Supreme Court of Colorado, En Banc.
January 30, 1995.
*248 Indian Law Clinic, Robert J. Golten, Boulder, for petitioner.
David C. Johnston, Paonia, for respondents.
James Schum, Hotchkiss, guardian ad litem for C.C.R.S.
Children's Legal Clinic, Seth A. Grob, Shari Shink, Denver, for amicus curiae Children's Legal Clinic.
The Nat. Ass'n of Counsel for Children, Donald C. Bross, Marvin R. Ventrell, Denver, for amicus curiae Nat. Ass'n of Counsel for Children.
Colorado Chapter of DeBoer Committee for Children's Rights, Ellen S. Minnig, Shelly Volkman, Englewood, for amicus curiae Colorado Chapter of DeBoer Committee for Children's Rights.
Justice VOLLACK delivered the Opinion of the Court.
We granted certiorari to review the opinion of the court of appeals in In re the Custody of C.C.R.S., 872 P.2d 1337 (Colo. App.1993). The overriding question at issue in this case is whether the best interests of the child standard, without a showing of parental unfitness, is the appropriate test for resolving a custodial dispute between a natural parent and psychological parents under section 14-10-123, 6B C.R.S. (1987).
The court of appeals determined that (1) the respondents did not lack standing to seek custody under section 14-10-123 of the Uniform Dissolution of Marriage Act (UDMA); (2) section 14-10-123 could be used by non-parents, who have custody of a child in contemplation of relinquishment and adoption proceedings, to obtain custody of the child; and that (3) due process did not require a showing of parental unfitness where there is no termination of parental rights.[1] We affirm the court of appeals' decision. We hold that the respondents have standing to petition this court for custody under either section 14-10-123(1)(b) or (1)(c). We further hold that the best interests of the child standard is the paramount consideration in a custodial dispute between a natural parent and the psychological parents. Accordingly, the trial court's award of custody to the respondents, because it was in the best interests of the child, was proper.

I.
The trial court's undisputed findings of fact are as follows.[2]
On March 5, 1990, C.R.S., the petitioner, gave birth to a son, C.C.R.S. At the time of birth, C.R.S. was twenty-three years old and unmarried. During her pregnancy, C.R.S. decided to place her son for adoption.[3] On March 6, 1990, the day after the birth of C.C.R.S., C.R.S. signed a release-of-custody form and a document entitled "Petition for Relinquishment and Waiver of Notice and Petition for Termination of the Parent-Child Relationship of Natural Father," both drafted by the respondents' attorney.
The custody agreement stated that, upon the birth of C.R.S.'s child, full custody would be given to the respondents, including authority to authorize medical treatment and make educational and religious decisions concerning the child pending finalization of the adoption proceedings. The petition for relinquishment stated that C.R.S. would relinquish her parental rights after the child was one year old so that the respondents could adopt him. It additionally stated that C.R.S. desired to relinquish the child because she believed she would be unable to provide a *249 suitable social environment in which to raise the child and that she was motivated by the best interests of the child. Finally, the petition requested the court to terminate the parent-child legal relation of the natural father (the identity of the father of C.C.R.S. is unknown).[4] The parties agreed that the petition for relinquishment of the mother's parental rights and petition for termination of the father's parental rights would be filed one year later. They contemplated that at that time a court could enter a final order transferring legal custody and guardianship of the child to the respondents.[5]
Pursuant to the agreement, the respondents were given physical custody of C.C.R.S. the day after his birth. C.C.R.S. lives with the respondents in their home located on Colorado's Western Slope and has continued to reside with them since that time. Despite the trial court's grant of continued visitation to C.R.S., C.R.S. has visited C.C.R.S. twice since his birth and has made little effort to establish a relationship with the child.[6]
Approximately six months after C.C.R.S. was placed with respondents, C.R.S., through an agent, attempted to revoke her release of custody by informing the respondents that C.R.S. had changed her mind about the adoption. C.R.S., however, made no personal or written demand for the return of C.C.R.S., nor did she initiate any immediate proceedings seeking to establish or restore her right to custody.
The respondents refused to return C.C.R.S. to C.R.S. Instead, approximately two weeks later, the respondents filed a motion for a temporary order to restrain C.R.S. from taking C.C.R.S. and contemporaneously filed a petition for custody in the Delta County District Court.[7] The respondents' petition alleged that C.C.R.S. had lived with them since birth, that a strong emotional and psychological bond had developed between the respondents and C.C.R.S., and that it was in the best interests of C.C.R.S. to award legal custody to the respondents.
A magistrate held a hearing to determine temporary custody in October of 1990. The magistrate granted temporary custody of C.C.R.S. to the respondents with visitation rights to C.R.S. Though notified, C.R.S. did not attend this hearing nor was she represented at the hearing by an attorney.
Immediately prior to the temporary custody hearing, the Oglala Sioux Indian Tribe sought to intervene and have the proceedings transferred to the tribal court pursuant to the Indian Child Welfare Act, 25 U.S.C.A. §§ 1901-1963 (1983). On July 23, 1991, the magistrate entered an order transferring jurisdiction to the tribal court. This decision was reversed on October 7, 1991, upon a finding that C.C.R.S. was not eligible for enrollment in the tribe and therefore the case was not subject to the Indian Child Welfare Act. That ruling has not been challenged.
On June 17, 1991, C.R.S. filed a renunciation of the custody agreement and the petition for relinquishment and requested that she be awarded custody of C.C.R.S. The renunciation was accompanied by an affidavit stating that she did not fully understand the import of either the custody agreement or the petition for relinquishment, that she did not have the advice of an attorney prior to executing the documents, and that she had *250 changed her mind about relinquishing her parental rights.
In May 1992,[8] the trial court conducted a two-day trial to the court in order to determine custody of C.C.R.S.[9] The court heard testimony from the parties involved, two clinical psychologists regarding issues related to psychological attachment between adults and children and the consequences of interrupting such attachment, and two social workers from the Denver Department of Social Services. The court made extensive findings of fact. The court found that a parent-child relationship had developed between the child and the respondents and that a severance of that relationship would be psychologically traumatic to the child.[10] The trial court acknowledged that the mother "has demonstrated that she can be a fit and proper parent" as evinced by her success with another child, a seven-year-old son.[11] Notwithstanding C.R.S.'s fitness, the court determined that the respondents could provide a more "secure and healthy home environment" than the natural mother.
Based on these findings, the trial court concluded that it was in the best interests of C.C.R.S. to remain in the custody of the respondents.[12] Accordingly, the court granted respondents both physical and permanent legal custody of C.C.R.S. subject to C.R.S. having continuing rights of visitation. The court additionally ordered the respondents to make reasonable efforts to actively promote C.C.R.S.'s awareness of both his Indian and Hispanic heritage. The court finally noted that any further custody proceeding would be decided under section 14-10-131, 6B C.R.S. (1987), which allows C.R.S. to seek a change of custody.
With one member of the court dissenting, the court of appeals affirmed. The majority held that (1) the respondents did not lack standing to seek custody under section 14-10-123, 6B C.R.S. (1987), of the UDMA; (2) section 14-10-123 could be used by non-parents, who have custody of a child in contemplation of relinquishment and adoption proceedings, to obtain custody of the child; and (3) that due process did not require a showing of parental unfitness where there was no termination of parental rights.
The dissenting judge argued that C.R.S.'s relinquishment was invalid, and that the respondents lacked standing under the UDMA to seek custody of C.C.R.S. The dissent additionally maintained that the respondents had gained temporary custody of C.C.R.S. through the Children's Code and that, once C.R.S. withdrew her consent to the relinquishment and adoption procedure, C.C.R.S. should have been returned to C.R.S. The dissent finally contended that, prior to applying a best interests of the child standard, there must first be a finding by clear and convincing evidence that the natural parent is unfit. Because C.R.S. was not found to be an unfit mother, the dissent concluded that her due process rights were violated.
We granted certiorari and now review the following three issues:

*251 Whether the court of appeals erred in concluding that respondents had standing to seek custody of C.C.R.S. under section 14-10-123, 6B C.R.S. (1987), of the Uniform Dissolution of Marriage Act.
Does a biological parent have a statutory right to the return of her child when she changes her mind several months after purportedly relinquishing her child for adoption, where the mother's relinquishment fails to meet statutory requirements[?]
Whether the court of appeals erred in holding that due process does not require a showing of parental unfitness prior to applying the best interest of the child standard to determine custody of a child under section 14-10-123, 6B C.R.S. (1987), of the Uniform Dissolution of Marriage Act.
C.R.S. maintains that the respondents lacked standing under section 14-10-123(1) to retain custody of C.R.S.'s infant once C.R.S. revoked her relinquishment. C.R.S. additionally claims that, upon her revocation of the relinquishment, the respondents no longer had the lawful right to retain physical custody of C.C.R.S., and that she had a statutory right under the Children's Code to the immediate return of her son. C.R.S. finally asserts that the trial court's failure to award her custody of her son, absent a finding of parental unfitness, offended her constitutional rights. We will address these contentions separately.

II.
Section 14-10-123(1)(b), 6B C.R.S. (1987), was adopted verbatim from section 401(d) of the UDMA. The statute states in pertinent part:
XX-XX-XXX. Commencement of Custody ProceedingsJurisdiction. (1) A child custody proceeding is commenced in the district court or as otherwise provided by law:
....
(b) By a person other than a parent, by filing a petition seeking custody of the child in the county where the child is permanently resident or where he is found, but only if the child is not in the physical custody of one of his parents[.]
In 1973, section 14-10-123 was amended by the addition of a new subsection, now codified as section 14-10-123(1)(c), 6B C.R.S. (1987). Under section 14-10-123(1)(c), a custody proceeding may be commenced:
(c) By a person other than a parent who has had physical custody of a child for a period of six months or more, if such action is commenced within six months of the termination of such physical custody.
Under section 14-10-123, a non-parent must first satisfy the threshold issue of "standing" by demonstrating who has "physical custody" of the child. If the biological parents have "physical custody," then a non-parent does not have standing to seek custody of the child. Conversely, a non-parent can establish standing by demonstrating that the child is not in the "physical custody" of one or both of the biological parents under section 14-10-123(1)(b), or that, under section 14-10-123(1)(c), the non-parent has had "physical custody" of the child for at least six months and a custody proceeding is commenced within six months after the physical custody has ended. If either subsection (b) or (c) is satisfied, then the non-parent has established standing and the court will consider the non-parent's claim for the custody of the child based upon the best interests of the child standard.
In concluding that the respondents had standing to seek custody under section 14-10-123, both the trial court and the court of appeals adopted a literal meaning of the term "physical custody." Both courts construed "physical custody" to mean actual, physical possession of a child. Specifically, the court of appeals stated:
In enacting § 14-10-123(1)(c), the Colorado General Assembly has indicated its preference for a more literal meaning of the phrase "physical custody." Under that section, a non-parent having had physical custody of a child for six months or more is granted standing to commence proceedings for legal custody of such child so long as such proceedings are begun within six months after the physical custody has ended.

*252 The adoption of this section constitutes legislative recognition of the effects of "psychological parenting" upon the best interests of a child. See also § 19-3-702(5)(b), C.R.S. (1993 Cum.Supp.) (recognizing need for custodial stability and permanency planning for children adjudged dependent or neglected and removed from physical custody of their parents without terminating the parent-child relationship). It also makes clear that the Colorado General Assembly did not intend to equate "physical custody" with either "legal custody" or the "parental right to continued physical or legal custody."
In Re the Custody of C.C.R.S., 872 P.2d at 1341.
In contrast, C.R.S. argues that "physical custody" means more than actual, physical possession of a child and that a court should look to a number of factors, including the manner in which the child came into the non-parent's physical possession, the intentions and expectations of the natural parents when relinquishing the child, and the duration of the non-parent's possession.
Because the term "physical custody" is not defined in either the UDMA or the Uniform Marriage and Divorce Act (the Uniform Act),[13] the determination of non-parents' standing to commence a custody action under section 14-10-123(1), 6B C.R.S. (1987), is contingent upon our construction of the term "physical custody." The interpretations offered by both the majority of the court of appeals and the dissent have support within the law.
The plausibility of the majority's position is reinforced by the statutory rule that statutes relating to the same subject matter should be construed harmoniously in order to avoid inconsistent or absurd results. In re Marriage of Ford, 851 P.2d 295 (Colo.App.1993). Both the UDMA, in the Domestic Matters Code,[14] and the Uniform Child Custody Jurisdiction Act (UCCJA), in the Children's Code,[15] apply to custodial dispositions of minor children, but each of the codes has different requirements for obtaining custody or maintaining an action. Because the term "physical custody" is defined in section 14-13-103(9), 6B C.R.S. (1987), of the UCCJA as "actual possession and control of a child," it would be contrary to common sense to define "physical custody" differently for purposes of the UDMA. Further, the majority's interpretation finds support in section 14-10-123.5(1), 6B C.R.S. (1987), of the UDMA which distinguishes between legal custody and physical custody in defining "joint custody."
C.R.S.'s interpretation of the term "physical custody" finds support in other jurisdictions that have adopted and interpreted provisions identical to section 401(d) of the UDMA. These cases have precluded standing for third parties where the natural parent retained legal care and control of the child. See Marshall v. Superior Court, 145 Ariz. 309, 701 P.2d 567 (1985) (finding that a non-parent did not have physical custody where the biological parent retained legal rights to the child); Webb v. Charles, 125 Ariz. 558, 611 P.2d 562, 565 (Ct.App.1980) (holding that, where a natural father "had not relinquished his legal rights to his son, ... the grandmother had no standing under A.R.S. § 25-331(B)(2)"); In the Matter of McCuan, 176 Ill.App.3d 421, 125 Ill.Dec. 923, 531 N.E.2d 102 (1988) (concluding that, to establish standing, non-parent must show that biological parent relinquished "legal custody," not just physical possession of the child); Henderson v. Henderson, 174 Mont. 1, 568 P.2d 177 (1977) (finding that the term "physical custody" is not limited to having actual, physical possession of the child, but relates to the custodial rights involved in the care and control of the child).
These jurisdictions construed the term "physical custody" in accordance with the *253 factual scenarios presented and the overriding policy of discouraging abductions of minors at the time of filing the petition for custody.[16] For example, in Marshall, the natural mother was awarded custody in the marital dissolution proceeding. The natural father and his mother thereafter sought a change of custody and the trial court reasoned that it retained jurisdiction to change custody despite the fact that the child remained in the physical custody of the mother. In Webb, the child, who was living with his parents, was taken to his maternal grandmother's home on a temporary basis after his mother died. The father requested the return of the child and the grandmother refused. The father thereafter filed a habeas corpus petition. The court determined that legal custody of the child automatically vested in the father after the child's mother died. Similarly, in Henderson, the sister of the deceased father petitioned the court for temporary custody of the child upon the father's death. The aunt argued that the requirement that the children not be in the physical custody of one of the parents was met because, at the time of the father's death, they were being cared for by a babysitter. The court determined that this argument lacked merit. The court reasoned as follows:
"Physical custody" is not limited to having actual, immediate control of the physical presence of the child. Rather, this phrase relates to the custodial rights involved in the care and control of the child. To interpret this phrase otherwise would allow a nonparent to file a petition for custody anytime the child is out of the physical presence of the parent or parents, even if for a few minutes, or under the watchful eyes of an authorized babysitter, as here. 568 P.2d at 181 (citations omitted); see also McCuan, 531 N.E.2d at 106 ("[A] mother does not relinquish custody for purposes of the statute merely because she leaves a child with her in-laws for the weekend.").
In contrast, in the present case, C.R.S. voluntarily relinquished physical custody of C.C.R.S. to the respondents the day after he was born, with the intention of terminating her parental rights upon his adoption by the respondents.[17] C.R.S. and C.C.R.S. were separated from one another during the crucial bond-forming time at infancy and this separation divested C.R.S. of physical custody of C.C.R.S. within the meaning of the statute. C.C.R.S. had been in his prospective adoptive family's home, and under the respondents' control, for approximately six months. The respondents only filed their petition for custody after C.R.S. advised them that she was withdrawing her consent to the adoption and wanted C.C.R.S. returned to her.
Under the facts of this case, we hold that the respondents have standing to petition this court for custody. Since the respondents had physical possession and control of C.C.R.S. for six months before the filing of their custody petition, the respondents have standing to bring this action under either section 14-10-123(1)(b) or (1)(c). We therefore conclude that the court of appeals was correct in adopting its literal definition of "physical custody" that factors in the amount of time a child has spent in the actual, physical possession of a non-parent and the psychological bonds non-parents develop with children who have been in their physical possession and control for a significant period of time.

*254 III.
We next briefly remark upon C.R.S.'s contention that, as the natural mother, she had a statutory right under the Children's Code to the return of her child after she changed her mind about placing C.C.R.S. for adoption.
The trial court awarded custody to the respondents pursuant to section 14-10-123 of the UDMA, and not pursuant to any provision in the Children's Code. The trial court recognized that the petition for custody was never filed under the Children's Code and therefore concluded that the Children's Code did not apply. The court of appeals affirmed. We agree that the Children's Code is inapplicable to this case.
A petition for adoption requires that the child is available for adoption. This can be accomplished by the natural parent's relinquishing his/her right to the child. Prior to the juvenile court's issuing an order relinquishing a natural parent's right to the child under the Children's Code, the relinquishing parent is required to obtain counseling from the county department of social services. See § 19-5-103(1)(a), (4), 8B C.R.S. (1994 Supp.). Moreover, the juvenile court must be satisfied that the parent has been advised of the consequences of his/her actions. See § 19-5-103(4), (7). It is undisputed that C.R.S. never obtained the counseling required by section 19-5-103(1). It is also undisputed that the petition for relinquishment was never filed in the juvenile court and the juvenile court never entered a final order of relinquishment.
Further, the custody agreement stated that the respondents had to wait a minimum of one year before they could file the petition for relinquishment and adoption. See also § 19-5-104(1)(d), 8B C.R.S. (1994 Supp.). The earliest date respondents could therefore pursue a relinquishment and adoption proceeding was March 6, 1991. On August 31, 1990, however, an agent of C.R.S. informed respondents that C.R.S. was revoking her consent to the relinquishment of C.C.R.S. When C.R.S. revoked her relinquishment of C.C.R.S., an adoption by the respondents was no longer legally possible. Accordingly, the parties did not have available to them the statutory procedures providing for adoption and relinquishment under Article 5 of the Colorado Children's Code, sections 19-5-101 to -304 (1994 Supp.). Therefore, the prospective adoption proceeding turned into a custodial dispute under the UDMA, which did not involve a termination of parental rights.
Despite the fact that the petition for relinquishment did not comply with the statutory requirements for effectuating a relinquishment, at the time that C.R.S. revoked the agreement, C.R.S. had no statutory right under the Children's Code to the automatic return of C.C.R.S. Rather, at this time, C.R.S. had legal avenues available to her, which she chose not to pursue, in order to reclaim her child.[18]

IV.
We now consider whether the trial court correctly analyzed the custodial dispute between C.R.S. and the respondents. The trial court applied the best interests of the child standard and awarded custody to the respondents. The court of appeals concluded that the trial court was correct in determining the issue of custody under a best interests of the child standard. The court of appeals additionally determined that, since this proceeding did not result in the termination of parental rights, no finding of parental unfitness was required under section 14-10-123.
C.R.S. contends that, as the biological mother of C.C.R.S., she has a fundamental liberty interest in the care, custody, and management of her child. Accordingly, C.R.S. asserts that awarding custody under section 14-10-123 in the absence of a finding of parental unfitness violates her fundamental liberty interest in C.C.R.S. C.R.S. cites *255 Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972),[19]Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978),[20]Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983),[21] and Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982),[22] to support her position. None of these cases is authoritative or persuasive. All of these cases dealt with the termination of parental rights by which the natural parent was denied "physical custody, as well as the rights ever to visit, communicate with, or regain custody of the child." Id. at 749, 102 S.Ct. at 1392. Further, all of these cases additionally determine that the natural parent enjoys certain procedural protections during a termination proceeding, and none supports C.R.S.'s assertion that she has a substantive custodial right to the child.
The situation before us, in contrast, involves a custody dispute between a natural parent and psychological parents where the natural mother's parental rights are not being terminated by awarding custody to the respondents. Rather, C.R.S. was permitted to retain visitation rights with her child and accordingly, her parental rights were preserved in a limited context. Further, awarding custody to the respondents does not preclude a later change of custody to C.R.S.
*256 In a custody dispute between the natural parents, a court determines custody by using a best interests of the child standard. Miller v. Miller, 129 Colo. 462, 271 P.2d 411 (1954); Grosso v. Grosso, 149 Colo. 183, 368 P.2d 561 (1962); see also § 14-10-124(1.5), 6B C.R.S. (1987). In determining a custodial dispute between a parent and a non-parent,[23] Colorado courts recognize a presumption that the biological parent has a first and prior right to custody. This presumption may be rebutted by evidence establishing that the welfare of the childi.e., the best interests of the childis better served by granting custody to a non-parent. Abrams v. Connolly, 781 P.2d 651, 657 (Colo. 1989) (finding that custody of the child does not automatically vest with the non-custodial natural parent when the custodial parent dies; the best interests of the child are the overriding consideration); Root v. Allen, 151 Colo. 311, 318, 377 P.2d 117, 121 (1962).
Courts in other jurisdictions have considered custody disputes between natural parents and non-parents. Some states recognize the importance of a child's maintaining psychological attachments to long-term unrelated caretakers and hold that custody should be decided in the way which best serves the child's interests. See, e.g., Ortner v. Pitt, 187 W.Va. 494, 419 S.E.2d 907 (W.Va.1992) (holding that, despite a lack of abandonment or unfitness on the part of the natural mother, the grandmother had become a "psychological parent" to the child, who had resided with her for a significant period of time, and thus custody must remain with her.); R.A.D. v. M.E.Z., 414 A.2d 211 (Del.Super.Ct.1980) (finding that an award of custody of the child to the maternal grandmother was appropriate even though it was not shown that either of the natural parents was unfit or the child was neglected); Reflow v. Reflow, 24 Or.App. 365, 545 P.2d 894 (1976) (concluding that the natural mother did not have the right to change custody of her children since removing the children from the third party's physical custody, pursuant to a marital dissolution action, would cause psychological and emotional harm. The court stated that the preference to be accorded the parent is subject to the best interests of the child in a marriage dissolution case, a juvenile court case, an adoption case, or in a habeas corpus proceeding.); Sorentino v. Family & Children's Soc'y of Elizabeth, 72 N.J. 127, 367 A.2d 1168 (1976) (holding that the natural parents have the burden of proving that no psychological harm results in removing child from home of prospective adoptive parents).
Other states hold that a natural parent may not be deprived of the right to custody absent a showing of parental unfitness. See, e.g., Sheppard v. Sheppard, 230 Kan. 146, 630 P.2d 1121 (1981), cert. denied, 455 U.S. 919, 102 S.Ct. 1274, 71 L.Ed.2d 459 (1982); Stuhr v. Stuhr, 240 Neb. 239, 481 N.W.2d 212 (1992); Rozas v. Rozas, 176 W.Va. 235, 342 S.E.2d 201 (1986); Barstad v. Frazier, 118 Wis.2d 549, 348 N.W.2d 479 (1984).
Colorado courts have long recognized the child's best interests as a guiding principle in awarding custody to a person other than a natural parent. In Wilson v. Mitchell, 48 Colo. 454, 465, 111 P. 21, 25 (1910), involving a custodial dispute between the child's paternal grandparents and the natural mother, we stated that, "in controversies affecting the custody of an infant, the interest and welfare of the child is the primary and controlling question by which the court must be guided." The paternal grandmother in Coulter v. Coulter, 141 Colo. 237, 347 P.2d 492 (1959), was also awarded custody over the natural mother. This court held that a natural parent enjoys a preference in custody cases but does not necessarily obtain custody even if the natural parent is found to be fit, unless it serves the best interests of the child. Id. at 241, 347 P.2d at 494. In discussing Wilson, the Coulter court stated:
While the Wilson case indicates that the natural parents have a first and prior right to custody, we do not interpret it as requiring that custody be awarded to the parent or parents merely because the evidence shows fitness and ability to care for *257 the child. The controlling factor, recognized and applied in all of these cases, and confirmed in the Wilson case, is the welfare of the child.
Id.
The court also quoted from Hocheimer's Custody of Infants, as follows:
"Unquestionably when the power of the court is invoked to place an infant into the custody of its parents and to withdraw such child from other persons, the court will scrutinize all the circumstances and ascertain `if a change of custody would be disadvantageous to the infant.' If so, the change will not be made, `and it matters not whether it is through the fault or the mere misfortune of the legal guardian that the infant has come to be out of his custody.'"
Id.
In Devlin v. Huffman, 139 Colo. 417, 339 P.2d 1008 (1959), the mother had been awarded legal custody of three children pursuant to a divorce proceeding. Unable to care for her children, the mother gave physical custody to her parents, who had custody for six years. She thereafter filed a habeas corpus action against her parents for the return of her children. The grandparents refused to acquiesce. We awarded custody to the grandparents based on the best interests of the children. We stated that "[t]he law is equally well settled that in custody proceedings the welfare and best interests of the children is the paramount consideration." Id. at 420, 339 P.2d at 1010; see also Walcott v. Walcott, 139 Colo. 37, 336 P.2d 298 (1959) (concluding that the paternal grandmother should be awarded custody over the natural mother based on the best interests of the child).
Further, in Root v. Allen, 151 Colo. 311, 377 P.2d 117 (1962), pursuant to a divorce agreement, a mother was awarded custody of her child subject to the natural father's visitation rights. The mother remarried and the child lived with the mother and her stepfather. At the time of the mother's death, the stepfather requested the natural father's consent to the stepfather's adoption of the child. The natural father refused and instead requested the stepfather to relinquish the child back to him, which the stepfather declined to do. The natural father thereafter filed a petition for habeas corpus. The trial court denied the habeas corpus petition. The trial court specifically found:
"That if [the child] were to return to [the natural father], if she were to leave [her psychological father] with whom she has lived for these years, the effect would be very damaging. The natural ties between parents and children do not endure unless they are nurtured. It is unmistakably important that children have a sense of continuity, or otherwise stated, that they are unable [sic] to avoid the damages which result from serious separations. This need that a child has for continuity, the need to avoid separation, is particularly marked at certain times in life."
Id. at 314, 377 P.2d at 119.
We therefore determined that, although the natural father was a fit and proper person, it was nevertheless in the child's best interests to remain in the custody of the stepfather with whom she had lived for five years. See also Petition of R.H.N., 710 P.2d 482 (Colo.1985) (concluding that the best interests standard, and not parental fault standard, should be used in step-parent adoption cases).[24]
Based on our long line of cases involving custody disputes, and the foregoing case law from other jurisdictions, we conclude that the best interests of the child standard is the prevailing determination in a custody contest between biological parents and psychological parents.[25] Our foremost priority *258 is therefore to resolve the dispute in a way that minimizes the detriment to the child.[26]
The resolution of this custody matter must rest upon the judgment of the trier of fact, and we are reluctant to disturb a ruling of the trial court in light of the evidence presented, absent an abuse of discretion. Coulter, 141 Colo. at 242, 347 P.2d at 495. The trial judge had an opportunity to hear the testimony, observe the witnesses and their demeanor, evaluate the fitness of both the natural mother and the respondents, the psychological attachments developed by the child, and the cultural identity of the child and each set of parents, in making his findings. The trial court found that the respondents had become the psychological parents of the child and that disrupting the emotional bond that had formed between them "would likely prove devastating to the child and would result in long-term, adverse psychological effects on the child." The trial court therefore awarded custody to the respondents and gave the natural mother rights to visitation. The trial court did not terminate C.R.S.'s parental rights.
We have carefully reviewed the record in light of the claims advanced and have determined that the trial judge applied the appropriate standard to the facts and arrived at the correct result. As the trial court found, C.C.R.S. has lived with the respondents for the entire four and one-half years of his life and, to C.C.R.S., this is the only home he has ever known. C.C.R.S. is happy and well adjusted. The respondents have formed a loving relationship with the child, the respondents have raised C.C.R.S. since birth, the respondents have fulfilled C.C.R.S.'s psychological needs, have provided a stable home for C.C.R.S., and, above all, C.C.R.S. identifies the respondents as his parents. The continuation of this relationship can therefore be presumed to be in the child's best interests.
Conversely, C.R.S. has never assumed any of the responsibilities of a parent. C.R.S. has never contributed to the education and welfare of her child. She has failed to provide any monetary support and has failed to establish any emotional attachment or personal contact with C.C.R.S. C.R.S. visited the child twice prior to the trial, and, despite being awarded visitation privileges, C.R.S. has not seen C.C.R.S. since the trial.
Removing C.C.R.S. from the parents he has known, with whom he has emotionally bonded, and giving custody to his biological mother, who is virtually a stranger to him, ignores the welfare of the child and is likely to have a detrimental effect on his emotional and psychological well-being.
We have the difficult task of trying to resolve the custodial dispute in the least damaging manner to the child. Unfortunately, custodial contests tend to be emotionally charged situations where one party is not necessarily satisfied with the arrangement. Although we empathize with C.R.S., we agree with the court of appeals that it is in C.C.R.S.'s best interests to continue in the custody and care of the respondents.

V.
We affirm the court of appeals' judgment and hold that the respondents have standing to petition this court for custody under either section 14-10-123(1)(b) or (1)(c). We further conclude that the best interests of the child *259 standard is the paramount consideration in a custodial dispute between a natural parent and the psychological parents. Accordingly, the trial court's award of custody to the respondents, because it was in the best interests of the child, was proper.
LOHR, J., dissents, and KIRSHBAUM and SCOTT, JJ., join in the dissent.
SCOTT, J., dissents, and LOHR and KIRSHBAUM, JJ., join in the dissent.
Justice LOHR dissenting.
The majority holds that the respondents, because of their physical possession of C.C.R.S. and despite the petitioner's revocation of consent to physical custody, acquired standing to petition a court for custody under section 14-10-123, 6B C.R.S. (1987), of the Uniform Dissolution of Marriage Act (UDMA). Maj. op. at 249, 254. The majority thus allows disappointed prospective adoptive parents to circumvent the relinquishment and adoption provisions of the Colorado Children's Code and pursue custody under the UDMA. The majority also holds that a biological parent does not have a fundamental constitutional right to physical custody of her child. Maj. op. at 255-256. Therefore, a trial court is not required to find a parent unfit before awarding custody to a non-parent. Maj. op. at 258. According to the majority, a trial court need only consider the best interests of the child when making custody determinations between a parent and a non-parent. Id. Because I believe that the majority has created an avenue by which prospective adoptive parents may circumvent the stringent statutory requirements for relinquishment and adoption through its interpretation of the standing requirement of the UDMA, I dissent. I also dissent because I believe that parents have a fundamental constitutional right to the care and custody of their children. Because of this right, a court should not be able to deprive parents of the custody of their children and award custody to a non-parent without a finding that the parent is unfit at least in absence of a compelling reason. I adopt the reasoning stated in the dissent written by Judge Taubman of the Colorado Court of Appeals in the decision that we now review. See In re the Custody of C.C.R.S., 872 P.2d 1337, 1345-55 (Colo. App.1993) (Taubman, J., dissenting). Because Judge Taubman comprehensively and persuasively addresses the majority's contentions in this case, I will not attempt to recapitulate the arguments here. I also join the dissent written by Justice Scott. I write only to emphasize some of the constitutional, practical, and policy reasons for my disagreement with the majority.
First, the majority holds that the respondents have standing under section 14-10-123, 6B C.R.S. (1987), because they had physical custody of C.C.R.S. The majority defines the term physical custody as used in sections 14-10-123(1)(b) and (c) to mean physical possession. Maj. op. at 253. This definition is excessively broad and creates an opportunity for abuse by unscrupulous custody seekers. This definition denies parents any necessary role in determining who will acquire physical custody of their children or what scope that custody might take. See 872 P.2d at 1349 (Taubman, J., dissenting). The definition also does not include consideration of the parent's intent in leaving the child in another's care. Under the majority's definition any caretaker, no matter how slight the parent's grant of authority, may gain physical custody of the child and have standing to petition for permanent custody. For example, a parent who leaves a child with a baby-sitter for a week while on vacation in no way intends to relinquish "physical custody" to the baby-sitter within the meaning of section 14-10-123(1). Yet under the majority's definition the baby-sitter could petition the court for a permanent custody hearing. While this may seem implausible, one need only look to other jurisdictions to find parents threatened with custody proceedings after temporarily entrusting their children to another's care. See Henderson v. Henderson, 174 Mont. 1, 568 P.2d 177 (1977) (aunt who picked up child while child was being cared for by baby-sitter brought suit for guardianship); In the Matter of McCuan, 176 Ill.App.3d 421, 125 Ill.Dec. 923, 531 N.E.2d 102 (Ct.1988) (grandparents petitioned for custody after mother placed children in their care for short period of time). The majority's definition provides courts with no basis to distinguish between *260 those to whom a parent makes a limited request for help in caring for a child, those to whom a parent has completely abandoned the child, and kidnappers for purposes of standing to petition for custody. The legislature could not have intended such a result.
Second, the majority by allowing non-parents after a failed relinquishment and adoption easily to petition for custody under the UDMA eviscerates the stringent procedures and policies underlying the Colorado parental rights relinquishment statute delineated in Article 5, part 1, of the Colorado Children's Code. See 872 P.2d at 1350-1352 (Taubman, J., dissenting).[27] The purpose of the relinquishment statute is "to promote the integrity and finality of adoptions to ensure that children placed in adoptive placements will be raised in stable, loving, and permanent families." § 19-5-100.2, 8B C.R.S. (1994 Supp.). The legislature also intended to protect children from the trauma of being uprooted from adoptive placements. Id. Section 19-5-103(1)(a), 8B C.R.S. (1994 Supp.), facilitates this policy by requiring parents who wish to relinquish their child to undergo counseling from the county department of social services. In addition, section 19-5-103(2), 8B C.R.S. (1994 Supp.), prohibits courts from terminating the parent-child legal relationship until the court is satisfied that the parent has been counseled. These statutes ensure that parents will not relinquish their parental rights without an understanding of the grave and serious nature of the decision. After counseling, a parent is less likely to make a hasty decision that will be regretted later. Parents fully aware of the consequences of their actions would be less likely to bring a suit or disrupt their children's new relationship with adoptive families. The facts of this case demonstrate the necessity for stringent adherence to the requirements of the relinquishment statute. The respondents did not follow the proper procedures for relinquishment and adoption of C.C.R.S.. The petitioner did not have counseling and was not fully advised of her rights. Perhaps because of this lack of counseling, the petitioner made an ill-informed decision that she later regretted. This law suit resulted and the lives of two families have been in turbulence for over four and a half years.
By allowing disappointed prospective adoptive parents to petition for custody under the UDMA, the majority creates a legal loophole in the relinquishment and adoption statutory framework. Disappointed prospective adoptive parents now have the opportunity to bring extensive litigation in an effort to gain custody of a child with whom they do not have a legally cognizable relationship. The majority thus creates a way for persons seeking to adopt to circumvent the requirements of the relinquishment and adoption statutes by merely seeking physical custody of a child. Under this scheme, biological parents will not be afforded the proper counseling necessary to make an informed choice. In addition, despite non-compliance with the statutory requirements, prospective adoptive parents are assured of the chance to retain physical custody. Moreover, once non-parents have physical custody of a child, there may be little a biological parent can do to regain custody. Trial courts utilizing the best interests of the child standard are often reluctant to remove a child from a home once the child has begun to develop psychological attachment to the family. The majority's creation of this option for disappointed prospective adoptive parents to pursue custody under the UDMA undermines the legislature's intent in crafting the relinquishment scheme to provide stable unions by requiring informed consent.
The present case demonstrates the problems with allowing this kind of circumvention of the Children's Code. The respondents were not entitled to adopt C.C.R.S. because *261 of their failure to comply with the statutory requirements of the Children's Code. In addition, as part of their agreement with the petitioner, the respondents agreed to wait a year from the time of the child's birth before instituting formal relinquishment and adoption proceedings. They did so apparently in order to ensure that a court would place guardianship of C.C.R.S. with them, rather than with the department of social services, after the petitioner relinquished parental rights. See § 19-5-104(1)(d), 8B C.R.S. (1994 Supp.). The respondents should have been aware of the inherent risk in this agreement that the petitioner could change her mind regarding relinquishment of parental rights. During this year the respondents had no legal right to custody of the child without the petitioner's consent. Yet, when the petitioner revoked her consent, as she had a right to do, the respondents instead of returning the child to its mother applied for custody under section 14-10-123 of the UDMA. The petitioner is now being denied her right to custody of her child despite the trial court's explicit finding that she will be a fit and proper parent. The majority's decision allows the respondents to circumvent the requirements of the Children's Code and maintain custody of the child of another.
The majority further undermines the legislature's intent to create stable adoptive families by leaving the two families in this case in legal flux. See 872 P.2d at 1351 (Taubman, J., dissenting). In this case, the respondents have physical custody of the child but are not able to adopt. Furthermore, the respondents must live with the possibility that custody could be altered in the future. Maj. op. at 256. The petitioner, on the other hand, is deprived of the opportunity to nurture and rear her child on a daily basis. The distance between her and her child is great and the cost for her to travel to see the child prohibitive. Her parental rights seem illusory at best, yet she is burdened by the legal responsibilities of parenthood. Moreover, the court will have continuing involvement in the lives of these two families through its role in monitoring visitation and other issues of conflict. Far from creating a stable familial structure for the child, the majority's decision leaves these families with only a temporary solution and little peace of mind.
Third, the majority holds that a trial court may grant physical custody of a child to a non-parent without finding that the parent is unfit. The majority holds that the best interests of the child standard should prevail in a custody contest between a parent and a non-parent. Maj. op. at 258. Because I believe that the opportunity to nurture and care for one's child on a daily basis that physical custody provides is central to providing parental care, I believe parents have a fundamental constitutional interest in the physical custody of their children. See 872 P.2d at 1352-55 (Taubman, J., dissenting). The United States Supreme Court has recognized that parents have a constitutionally protected liberty interest in the "care, custody, and management of their child." Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982). The United States Supreme Court has acknowledged that these rights do not attach by the fact of mere biology alone. Rather, biology gives one the opportunity to demonstrate a commitment to parenthood by coming forward to participate in the rearing of one's child. Lehr v. Robertson, 463 U.S. 248, 260-263, 103 S.Ct. 2985, 2992-94, 77 L.Ed.2d 614 (1983). Once a biological parent has undertaken this commitment, the parent establishes an interest that cannot be disturbed without due process of law. To this end the Supreme Court has required states to establish by clear and convincing evidence that constitutionally sufficient grounds for termination exist prior to terminating parental rights. Santosky, 455 U.S. at 769, 102 S.Ct. at 1403. Although in this case the petitioner's parental rights have not been terminated, the petitioner's opportunity to develop a nurturing relationship with her child has been severely curtailed. Because this nurturing relationship approaches the importance ascribed to an individual's parental rights, the same standard should apply in custody proceedings between parents and non-parents as in actual termination proceedings. Thus, a trial court should be required to find a parent unfit prior to severing custodial rights in favor of a non-parent.
*262 In Lehr v. Robertson the United States Supreme Court recognized that:
[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in `promot[ing] a way of life' through the instruction of children.
463 U.S. at 261, 103 S.Ct. at 2993 (quoting Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 816, 844, 97 S.Ct. 2094, 2109-10, 53 L.Ed.2d 14 (1977)). This bond continually developing and maturing on a daily basis is the essence of the parent child relationship. The best interests test in the context of a custody dispute between a parent and a non-parent does not adequately protect this bond. As the Supreme Court stated in Quilloin v. Walcott:
We have little doubt that the Due Process Clause would be offended `[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.'
434 U.S. 246, 255, 98 S.Ct. 549, 554 (1978) (quoting Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. at 862-863, 97 S.Ct. at 2119 (Stewart, J., concurring)). The best interests test can all too easily disadvantage the poor, the uneducated, and the otherwise disadvantaged individuals. In our society, we do not auction children off to those who can provide the best amenities and a more traditional household. We recognize the right of all individuals to procreate and to have a family. Absent compelling reasons, this parental right should be disturbed in favor of a non-parent only upon a finding that the parent is unfit.
The majority states that the Supreme Court cases dealing with parental rights established only procedural protections in termination proceedings and did not establish any substantive right to raise a child. Maj. op. at 256. The procedural protections established by the Supreme Court are not an end in themselves. They protect the fundamental interests that parents have in the care, custody, and management of their children. The ties that bind a parent and child are developed from the mutual efforts to love and support one another and the intimacy developed from common experience. The opportunity to develop and nurture these ties should not be denied without the utmost justification. Therefore, I would hold that parents have a fundamental interest in the physical custody of their children. This interest should not be disturbed in favor of a non-parent absent compelling reasons without a finding that the parent is unfit.[28]
For all the reasons so well expressed by Judge Taubman in his dissenting opinion in the Colorado Court of Appeals, I respectfully dissent.
KIRSHBAUM and SCOTT, JJ., join in this dissent.
Justice SCOTT dissenting:
I join the dissent of Justice Lohr. I write separately only to emphasize my concern that the majority gives impetus to those who believe that "possession is nine-tenths of the law"[29] and to those who might find it advantageous to ignore the Children's Code when seeking to adopt or claim custody of a child.
While I agree with the majority that "C.R.S. had no statutory right under the Children's Code to the automatic return of C.C.R.S.,"[30] maj. op. at 254, I do not agree, *263 however, that the Uniform Dissolution of Marriage Act, section 14-10-123, 6B C.R.S. (1987), provides respondents with the requisite standing to obtain custody of C.C.R.S., a child sought outside the marital relationship. Hence, because the majority creates rights based on "physical custody" or possession in individuals whom our relinquishment and adoption statutes under the Children's Code[31] do not recognize and, in effect, denies the protections embodied in the Children's Code, I cannot join its judgment. Moreover, because I believe the better reasoned analysis and result is that set forth in the dissenting opinion of Judge Taubman, In re Custody of C.C.R.S., 872 P.2d 1337, 1345-55 (Colo. App.1993) (Taubman, J., dissenting), I respectfully dissent.
It has been firmly established by this court that when interpreting statutes, we must strive to meet the intent of the General Assembly, thus giving meaningful effect to the whole of the statute. Colorado State Bd. of Medical Examiners v. Saddoris, 825 P.2d 39, 42 (Colo.1992) (statutes must be construed as a whole to give consistent, harmonious and sensible effect to all their parts); City of Lakewood v. Mavromatis, 817 P.2d 90, 96 (Colo.1991) (primary goal in determining meaning of statute is to ascertain and give effect to intent of legislature); Charlton v. Kimata, 815 P.2d 946, 949 (Colo.1991) (if possible, supreme court must give effect to every word of statute). Thus, when interpreting rights of parties before the court under comprehensive legislation such as the Children's Code, we are obliged to give meaning to all its provisions in an effort to further the public policy represented by the legislative scheme. A.B. Hirschfeld Press, Inc. v. Denver, 806 P.2d 917, 920 (Colo.1991). If statutes elsewhere in our laws touch upon the same subject but are potentially conflicting, courts should reconcile the statutes, if possible, to ensure a consistent and sensible application of the law. In re Estate of David v. Snelson, 776 P.2d 813, 818 (Colo.1989). Where the statutes cannot be reconciled, and there is a conflict between specific and general statutes, the provisions of the specific statute control to the extent of the inconsistency. In re M.S. v. People, 812 P.2d 632, 637 (Colo.1991).
By giving deferential effect to comprehensive statutes adopted by our General Assembly, courts recognize that legislators, not judges, are uniquely authorized to choose between alternatives of general application and, as a consequence, determine matters of public policy. This is true with regard to rights and procedures as to relinquishment and adoption, which is addressed comprehensively by the Children's Code on one hand, and, on the other hand, custody disputes arising out of the termination of a marital relationship, where child custody is regulated by the Uniform Dissolution of Marriage Act. Here, then, our task should be clear. The General Assembly has specifically designated that child adoptions be conducted under the relinquishment and adoption statutes appearing within the Children's Code.
In setting forth its legislative intent under the Children's Code at section 19-5-100.2, 8B C.R.S. (1994 Supp.), the General Assembly evinced its desire that all matters affecting the adoption of children be resolved within the Children's Code:
Legislative declaration. (1) The general assembly hereby finds that parental relinquishment and adoption of children are important and necessary options to facilitate the permanent placement of minor children if the birth parents are unable or unwilling to provide proper parental care. The general assembly further finds that adoption offers significant psychological, legal, economic, and social benefits not only for children who might otherwise be homeless but also for parents who are unable to care for their children and for adoptive parents who desire children to nurture, care for, and support. Conversely, the general assembly recognizes that disrupted adoptive placements often have a profound and negative impact on individuals, *264 particularly children, involved in the adoption proceedings.
(2) It is the purpose of this article to promote the integrity and finality of adoptions to ensure that children placed in adoptive placements will be raised in stable, loving, and permanent families. The general assembly intends that by enacting this legislation, it will be protecting children from being uprooted from adoptive placements and from the life-long emotional and psychological trauma that often accompanies being indiscriminately moved.
§ 19-5-100.2, 8B C.R.S. (1994 Supp.). Moreover, within the Children's Code, the General Assembly has made provisions for birth parent counseling, adoptive parent screening and other protective measures, including the application of limited but significant public resources to ensure, as much as possible, the permanent success of adoptive placements. The General Assembly has recognized the profound impact that adoption has on the lives of all who are affected by it, especially the children involved, and accordingly the adoption statutes are specially devised to provide maximum protection. Unlike the adoption statutes of the Children's Code which were specifically designed to be applied in situations where biological family structures are being permanently severed, parental rights being completely terminated, and new adoptive families created, the Uniform Dissolution of Marriage Act was created primarily to deal with custody disputes arising out of a termination of the marital relationship.
It seems obvious then, that the General Assembly did not intend that unrelated adults would utilize the Uniform Dissolution of Marriage Act to obtain standing to effect a permanent parental relinquishment and child adoption. By allowing the respondents to prevail in this case and receive permanent legal custody of C.C.R.S. without the benefit of the protections inherent in the Children's Code, the majority has subjected children and parents, biological and psychological, to harms the General Assembly has acted to avoid.
Accordingly, I respectfully dissent.
I am authorized to say that Justice LOHR and Justice KIRSHBAUM join in this dissent.
NOTES
[1] For clarity, T.A.M. and M.A.M., the psychological parents, are referred to hereinafter as the respondents.
[2] The record on appeal contains only certain pleadings, motions, documents, and the final court order regarding custody. The record does not contain transcripts of any of the hearings. For this reason, the statement of the facts is taken largely from the trial court's order, the briefs of the parties, and the court of appeals' opinion.
[3] The mother and the respondents, the prospective adoptive parents, were brought together through relatives and mutual acquaintances, and an agreement for private placement was arranged prior to the child's birth.
[4] The petition for relinquishment additionally contains an averment that C.R.S. is one-half Caucasian and one-half American Indian, but that she has no tribal affiliation and that the father of C.C.R.S. could not be an American Indian.
[5] The custody agreement pledged C.R.S.'s cooperation in obtaining counseling necessary for the relinquishment proceedings and an acknowledgement of her awareness of her right to independent legal counsel. C.R.S. nevertheless did not consult an attorney when she signed these documents, and the petition for relinquishment was never filed in court. We conclude that the custody agreement is unenforceable and that the petition for relinquishment is invalid since C.R.S. had not been adequately counseled nor fully advised of the consequences of the relinquishment as mandated by § 19-5-103(1)(a), (4), (6), (7), 8B C.R.S. (1994 Supp.).
[6] In its findings of fact, the trial court noted that C.R.S. has had a difficult time maintaining contact with C.C.R.S. due to the geographic distance between C.R.S.'s home and C.C.R.S.'s home and C.R.S.'s limited financial resources.
[7] The district court granted the temporary restraining order in an ex parte proceeding.
[8] The custody proceedings were delayed significantly by several factors: (1) the Tribe's request to intervene and its request for a series of continuances that resulted in protracted litigation; (2) the withdrawal of C.R.S.'s counsel; (3) the appointment of new counsel; and (4) new counsel's preparation for trial of the custody proceeding.
[9] Prior to the trial, C.R.S. advised her counsel that a man had acknowledged to her that C.C.R.S. was his child and had stated a willingness to help her in supporting him. The man's identity was revealed to the court and to the respondents' counsel, and the man was served with notice of the custody proceeding in early March 1992. No appearance was made in the custody proceeding by or on behalf of the alleged putative father.
[10] The lower court found persuasive "evidence that significant, life-long bonding occurs from the time of birth through at least three years six months and the Child's [then] present age of two years two months is a very critical time to interrupt the bonding process."
[11] The trial court additionally found that C.R.S. had demonstrated "stability in terms of a reasonably long-term residence in one location where she meets her responsibilities to keep rent paid timely and she maintains a clean home," and that psychological testing revealed that she "is maturing in her attitudes as an adult and a mother."
[12] The trial court additionally found that the respondents shared some Indian heritage and were sensitive to the child's needs in identifying with his Indian and Hispanic heritage.
[13] The Uniform Act does not have a section equivalent to section 14-10-123(1)(c).
[14] The UDMA is concerned primarily with custody disputes between parents, or disputes involving other persons where there is no longer a custodial parent.
[15] The Children's Code deals with the limited issue of neglect and abuse and involves the interests of the State in the well-being and welfare of the child.
[16] In these cases, the definition of "physical custody" was based upon interpretations of sections identical to § 14-10-123(1)(b). None of these jurisdictions, however, had a section containing language similar to § 14-10-123(1)(c) to further assist them in construing the term "physical custody." By adopting § 14-1-123(1)(c), the Colorado legislature has indicated that it does not intend "physical custody" and "legal custody" to be used interchangeably.
[17] In In re Custody of Menconi, 117 Ill.App.3d 394, 73 Ill.Dec. 10, 453 N.E.2d 835 (1983), the father placed his child with the child's paternal grandparents following the mother's death. The grandparents raised the child from her infancy till she was six-and-a-half years old. The father thereafter forcibly removed the child from the grandparents' home. The court held the grandparents had standing to petition for custody under § 601(b)(2) of the Illinois Marriage and Dissolution Act because the father had voluntarily relinquished physical custody of the child, the child had lived with the grandparents for an extended period of time, and the grandparents had integrated the child into their home.
[18] Since the custodial proceedings before us now were never commenced in the juvenile court under the Children's Code, we need not further address whether C.R.S. has a right to the return of C.C.R.S. based upon non-compliance with the relinquishment and adoption proceedings in the Children's Code.
[19] The child's best interests were implicitly considered by the Court in Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). Stanley was the first of four Supreme Court cases to address the rights of an unmarried father to establish or maintain a legally recognized relationship with his child. Id. at 646, 92 S.Ct. at 1210. The Court considered the constitutionality of a statute that denied an unwed biological father custody of his children after their mother died. Id. at 650-52, 92 S.Ct. at 1212-13. The Court rejected the State's presumption that an unwed father is an unfit parent. Holding the statute unconstitutional, the Court stated that due process requires the State to provide a due process hearing as to the father's fitness before terminating his parental rights in a dependency and neglect action commenced after the death of the children's mother.
[20] In Quilloin, the unwed father challenged the constitutionality of a Georgia statute which required consent from married parents or unwed mothers of a child prior to the adoption of the child born out of wedlock, but did not require the consent of the unwed father. 434 U.S. at 249-50, 98 S.Ct. at 551-52. The Court denied the unwed father's attempt to prevent the stepfather, now married to the natural mother of the child, from adopting the child. The Court held that the parental rights of a father who had never sought or had physical or legal custody of a child, and who had assumed only minimal responsibilities for the child's welfare and support, could be terminated in a step-parent adoption proceeding based upon the child's best interests rather than upon a finding of the natural father's unfitness. Id. at 255, 98 S.Ct. at 554-55. The Court emphasized that its holding was not an attempt by the State or the adoptive parents to break up a natural family, but rather was a recognition of a de facto family unit already in existence. Id. Therefore, the biological relationship of the unwed father alone did not create a constitutionally protected relationship.
[21] Lehr involved an unmarried father who contested a step-parent's adoption of his two-year old child. 463 U.S. at 249, 103 S.Ct. at 2987. Since the putative father had never established any personal, custodial, or financial relationship with his child, the State's failure to give him notice of the pending adoption proceeding, despite the State's actual notice of his existence and whereabouts, did not deny the putative father his rights of due process or equal protection. Id. at 256-65, 103 S.Ct. at 2990-96. The Court's decision turned on the relationship of the genetic father to the child:

The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessing of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.
Id. at 262, 103 S.Ct. at 2993-94.
The Court concluded that the statute, by differentiating between those fathers who had shown parental responsibility toward their children and those who had not, bore a substantial relation to the governmental objectives of "promot[ing] the best interests of the child, ... protect[ing] the rights of interested third parties, and ... ensur[ing] promptness and finality." Id. at 266, 103 S.Ct. at 2996.
[22] In Santosky, the Court noted that natural parents have a fundamental liberty interest in the care, custody, and management of their children and that, "[b]efore a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence." 455 U.S. at 747-48, 102 S.Ct. at 1391-92.
[23] Non-parent, as used in this analysis, "may include friends, relatives, grandparents, step-parents or child-care agencies, or, in other words, any person or agency other than the child's natural parent." 2 Homer H. Clark, The Law of Domestic Relations in the United States § 20.6, at 525 n. 1 (2d ed. 1987).
[24] Turner v. Hunter, 142 Colo. 129, 350 P.2d 202 (1960), is the only opinion which strays from our long-standing position. In Turner, this court stated that, absent a showing of unfitness, the natural mother's right to custody of her child, then ten years of age, prevailed over the sister of the child's deceased father, even though the child had been in the sister's custody since infancy. Turner ironically relies on Wilson, which held that the child's best interests are paramount, in arriving at its result. We conclude that Turner has been overruled by these later cases.
[25] With respect to adoption proceedings that are dismissed, the legislature has recently adopted modifications to the Children's Code in which the legislature has asserted the best interests of the child doctrine as the paramount consideration in determining custody of the child. See §§ 19-5-104(4.7), 19-5-105(3.4)(c), 8B C.R.S. (1994 Supp.). These amendments indicate the legislature's sensitivity to the importance of an established bond between a child and the person in whose custody he resides, and lend further support for our conclusion that the best interests of the child standard is controlling in this case.
[26] The court resolved competing interests in Borsdorf v. Mills, 49 Ala.App. 658, 275 So.2d 338 (1973), which closely approximate those with which we are confronted here. In Borsdorf, the State had removed the child, then twenty-one months old, from the mother's custody and placed him in a foster home. Several years later, the foster parents sought to adopt him and the mother objected. The court of appeals granted the foster parents permanent custody, stating: "[T]he evidence and reasonable inferences therefrom that the child knows only the [foster parents] as his parents, loves and is loved by them and is assured of a future in their home, is more than sufficient to support the decree of the court that his welfare will be best served in their custody." Id. 275 So.2d at 341.
[27] The legislature has also devised an extensive legislative scheme for protecting children from abuse and neglect and when necessary involuntarily terminating parental rights under the Dependency and Neglect Statute of the Colorado Children's Code. See Colorado Children's Code, Article 3, 8B C.R.S. (1994 Supp.). This statutory scheme fosters the dual goals of preserving the stability of families while ensuring the safety and protection of children. § 19-3-100.5, 8B C.R.S. (1994 Supp.). Section 19-3-604, 8B C.R.S. (1994 Supp.), sets out specific criteria for courts to apply when determining whether to terminate a parent-child legal relationship after a child has been adjudicated dependent or neglected.
[28] See supra, at 248 n. 1.
[29] See Swain v. Vogt, 206 A.D.2d 703, 614 N.Y.S.2d 780, 784 (3 Dept.1994) (Peters, J., dissenting) ("Unlike the old adage, in matters concerning parental rights and the best interests of a... child, possession is not nine-tenths of the law.") (citations omitted).

Make no mistake, this admonition applies to both the biological as well as the psychological parents in their dealings with or about children. Our constitution is not intended for adults alone. In re Gault, 387 U.S. 1, 13, 87 S.Ct. 1428, 1436, 18 L.Ed.2d 527 (1967).
[30] C.R.S.'s claim for immediate and automatic return of C.C.R.S. is subject to the interests of the state as set forth in our dependency and neglect statutes of the Children's Code, in particular the Child Protection Act of 1975, §§ 19-3-100.5 -103 (1994 Supp.), which allows the state to assume temporary protective custody, and the Parent-Child Legal Relationship Termination Act of 1977, §§ 19-5-101, -104 and -105 (1994 Supp.), which allows the state to terminate the parent-child legal relationship.
[31] Our Children's Code at Title 19 includes in article 5 a comprehensive scheme for relinquishment and adoption. §§ 19-5-100.2 to -403, 8B C.R.S. (1994 Supp.).