249 P.3d 775 (2011)
In the Matter of Minor Child D.I.S.
Alan Sidman and Sheryl Sidman, Petitioners
v.
Michael Sidman and Renee Sidman, Respondents.
No. 09SC483.
Supreme Court of Colorado, En Banc.
March 21, 2011.
Rehearing Denied April 11, 2011.[*]
*776 Beltz & West, P.C., Daniel A. West, Colorado Springs, Colorado, Attorneys for Petitioners.
Leo L. Finkelstein, Colorado Springs, Colorado, Attorney for Respondents.
Donna Furth, San Francisco, California, National Association of Counsel for Children, Maureen Farrell-Stevenson, Aurora, Colorado, Attorneys for Amicus Curiae National Association of Counsel for Children.
Office of the Child's Representative, Sheri Danz, Denver, Colorado, Attorneys for Amicus Curiae Colorado Office of the Child's Representative.
Rocky Mountain Children's Law Center, Jeff Koy, Elizabeth Fordyce, Denver, Colorado, Attorneys for Amicus Curiae Rocky Mountain Children's Law Center.
Litvak, Litvak, Merhtens and Epstein, P.C., Timothy R.J. Merhtens, Denver, Colorado, Attorneys for Amicus Curiae American Academy of Matrimonial Lawyers, Colorado Chapter.
Justice HOBBS delivered the Opinion of the Court.
Reviewing an unpublished opinion of the court of appeals, we address whether, in seeking to terminate a guardianship established by parental consent, fit parents may invoke the constitutional presumption that they make custodial decisions in the best interests of their child.[1] The United States Supreme Court enunciated this presumption in Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)(plurality opinion),[2] which we have implemented in In re Adoption of C.A., 137 P.3d 318 (Colo.2006), and in In re B.J., 242 P.3d 1128 (Colo.2010).
Parents in this case entered into a guardianship relationship with non-parent relatives under section 15-14-204(2)(a), C.R.S. (2010), so that mother could address significant health issues affecting their ability to care for the child. After mother successfully resolved her health issues, parents petitioned for termination of the guardianship.
The non-parent guardians opposed termination of the guardianship. The trial court and court of appeals ruled that, by consenting to the guardianship, parents implicitly lost the constitutional presumption that they make care, custody and control decisions in the best interests of their child, and could not invoke this presumption in seeking to terminate the guardianship. Analyzing our statutes and cases concerning custody and consensual guardianships, we disagree.
We hold that, in a guardianship established through parental consent under section 15-14-204(2)(a), parents delegate the day-to-day care, custody, and control of their child to the guardians as provided through the court's guardianship order. Parents may not interfere with the guardian's day-to-day decision-making, except in accordance with limitations contained in the order. Just as the fit parents' decision to consent to a guardianship is presumed to be in the best interests of the child, so too their decision to seek termination of the guardianship and regain care, custody, and control of the child is presumed to be in the best interests of the child, unless the guardianship order contains an express provision limiting the parents from asserting this presumption. In the absence of such a limitation in the guardianship order, as here, when fit parents seek to terminate the guardianship, guardians bear the burden of demonstrating by a preponderance of the evidence that termination of the guardianship is not in the best interests of the child. Accordingly, we reverse the judgment of the court of appeals.

*777 I.
D.I.S. was born to Alan and Sheryl Sidman ("father" and "mother," or collectively, "the parents") in Massachusetts in 1999. Soon after his birth, mother developed severe post-partum depression that prohibited her from providing care for the child. While father attempted to care for both mother and D.I.S., the situation became untenable. At nine months of age, the parents placed D.I.S. with his paternal grandparents, who also lived in Massachusetts. For the next ten months father visited his child on a weekly basis. However, based on the grandparents' age and health issues, the parents decided to place D.I.S. in the care of the child's paternal aunt and uncle, Michael and Renee Sidman of Colorado Springs ("the guardians").
In May of 2001 father flew to Colorado with D.I.S. and placed him in the home of the guardians. D.I.S. was nineteen months old. Prior to relocating their child to Colorado, the parents delegated to these relatives the power to perform "any and all acts necessary for medical, educational, residential, or other care" of D.I.S., pursuant to a signed power of attorney. § 15-10-104, C.R.S. (2010). In addition, father signed a letter addressed to the guardians detailing the reasons for placing his child in their care, with the understanding that the guardians would "support [father's] efforts to visit with and be in [D.I.S.'s] life and ultimately be reunited with D.I.S. in [the parents'] home."
Seven months after D.I.S.'s arrival in Colorado, the guardians obtained the services of legal counsel and petitioned the El Paso County District Court for guardianship of D.I.S., asserting this would allow them to travel out of state with D.I.S., provide him with medical insurance, and make emergency medical decisions on his behalf. While reluctant to agree, the parents signed consents to the guardianship, inserting the word "temporary" in the language granting their consent. The parents also provided an addendum explaining their preference to extend the power of attorney rather than enter into a guardianship, and that their consent to the guardianship rested on assuming that the guardianship, based as it was on a joint agreement with their relatives, would support ultimate reunification of D.I.S. with the parents.
At the guardianship hearing in January 2002, father appeared by phone without counsel. The magistrate engaged in a colloquy with father regarding the consent forms both parents had executed, pointing out that these forms "specify a consent to temporary guardianship." The magistrate then said that Colorado's guardianship statutes utilize "temporary" as "a term of art" limited to six months as opposed to indefinite-in-duration "permanent guardianships." Father indicated he understood this guardianship would likely have to be longer than six months but its object would be reunification of the parents with their son. The magistrate assured father he could request termination of the guardianship if the parents' situation changed and, if the parents were to withdraw their consent, the "guardianship will cease to exist." The magistrate's written order establishing the guardianship did not contain such a limitation on the guardianship; rather, the order recites that the parents knowingly and voluntarily entered into an "unlimited" guardianship with the guardians subject to a duty "to contact and consult with [the father] for major decisions."
In late November 2002, mother's post-partum depression appeared to be improving and the parents discussed with the guardians their desire to reunite with their child. However, reunification discussions halted in July 2003, when mother had a psychological breakdown. On the day of the breakdown, mother became paranoid that the guardians had planted a bomb in the car she and father were driving, and ultimately commandeered another person's vehicle, leading police on a high speed chase. After apprehension by the authorities, mother was hospitalized for approximately four to six weeks and diagnosed with bi-polar disorder. All criminal charges were dismissed based on her inability to form criminal intent.
After her psychological breakdown and discharge from the hospital, mother sought treatment from a psychiatrist. Due to consistent therapy and appropriate medication to treat her bipolar disorder, mother has been stable for over seven years.
*778 In April of 2004, the parents again initiated reunification discussions with the guardians. At this point, more than half of D.I.S.'s life had been spent in Colorado Springs, and he perceived the guardians as parental figures. Neither father nor mother had visited D.I.S. with regularity; mother's first visit occurred in June of 2004, over three years after the guardians assumed care of D.I.S. Father's visits were more consistent, occurring approximately two to three times per year, but his attempts to procure medical attention for his wife made traveling across the country difficult. The guardians viewed the parents' inconsistent visitation with D.I.S. as a lack of commitment to their son, a contention the parents vigorously dispute. Throughout the entirety of the guardianship, the parents have financed D.I.S.'s care.
Both parties retained experts, in Colorado Springs and Boston, to develop a reunification plan in late 2005 and early 2006, but the record shows no meeting of the minds as to what such a plan might entail. The parties and their experts labored under disparate understandings; the Colorado expert viewed reunification as a conditional goal, to proceed only if it were in the best interests of D.I.S., while the Boston expert believed reunification was an undisputed, mutual goal of the parties and that the parties were going to work on the most appropriate way to transition the child back to his parents.
Reunification discussions eventually collapsed due to a myriad of conflicting expectations. Despite reassurances from the parents, the guardians refused to travel to Massachusetts with D.I.S. to visit the parents and other members of the extended family, for fear that the parents would begin legal proceedings to prevent D.I.S. from returning to Colorado. In addition, the guardians did not allow D.I.S. to spend the night with his parents in their hotel room during their visits to Colorado Springs. While the parents hoped to spend a significant amount of time with D.I.S. in the summer of 2006, as part of a slow transition plan to allow them to assume parental responsibility, the guardians frustrated these trips by scheduling several out-of-state vacations during the same time period. The parents felt that the guardians obstructed their attempts to visit D.I.S. and develop a deeper relationship with their son. In turn, the guardians maintained that the parents' history of sporadic visits and mother's lack of an independent relationship with D.I.S. posed an obstacle to reunification.
In June of 2006, the parents filed a motion to terminate the guardianship. Prior to the hearing, the district court magistrate entered two orders. In the first, dated August 16, 2006, the magistrate determined that the motion to terminate guardianship would be decided under the best interests of the child standard. The second, dated June 22, 2007, ruled that the parents were not entitled to a presumption that their decisions regarding the custody of D.I.S. were in his best interests, and that this presumption had been extinguished when the parents consented to the placement of the child with the guardians. The order further assigned the parents the burden of proof, by a preponderance of the evidence, to show that termination of the guardianship was in the best interests of D.I.S.
The hearing on the parent's motion to terminate guardianship occurred in August, 2007. The court found that mother had resolved any health issues that prevented her from parenting D.I.S.:
The Court finds biological mother is now able to parent the minor child. [Her doctor] indicates biological mother's depression and psychosis have dissolved. [Her doctor] testified that biological mother's psychiatric illness is in remission and does not preclude her from fulfilling her duties as a parent.
Nevertheless, relying on a child and family investigator ("CFI") report, the trial court denied the parents' motion to terminate the guardianship. The magistrate found that the parents had failed to demonstrate by a preponderance of the evidence that termination of the guardianship would be in the best interests of D.I.S. In particular, the court adopted the CFI's view that removing D.I.S. from the guardians' home would be "traumatic" for him, and his relationship to his father was more "avuncular" than parental. With regard to the child's mother, the court *779 found her able to parent her child but noted the "dearth" of interaction between her and her child since his placement in Colorado. The magistrate appointed a parenting coordinator to develop a parenting schedule that would allow the parents to visit their child in Colorado every six weeks. The magistrate did not dispute the love and affection that the parents have for their child and acknowledged the consistent financial support that parents had given.
Prior to the August 2007 hearing, the parents filed a separate Declaratory Judgment action in El Paso County District Court. The parents asserted that Colorado's Probate Code was being applied to them in an unconstitutional manner; they argued they were entitled to a presumption that their decision to terminate the guardianship was in his best interests. This presumption, they argued, could only be overcome by clear and convincing evidence that termination of the guardianship was not in the best interests of the child. The district court affirmed the magistrate's ruling and denied relief to the parents.
The court of appeals consolidated both actions and affirmed the trial courts below. The court of appeals agreed that, when the parents consented to the guardianship, they lost the presumption that their decision to terminate the guardianship was in the best interests of the child. We disagree and reverse the judgment of the court of appeals.

II.
We hold that in a guardianship established through parental consent under section 15-14-204(2)(a), parents delegate the day-to-day care, custody, and control of their child to the guardians as provided through the court's guardianship order. Parents may not interfere with the guardian's day-to-day decision-making, except in accordance with limitations contained in the order. Just as the fit parents' decision to consent to a guardianship is presumed to be in the best interests of the child, so too their decision to seek termination of the guardianship and regain care, custody, and control of the child is presumed to be in the best interests of the child, unless the guardianship order contains an express provision limiting the parents from asserting this presumption. In the absence of such a limitation in the guardianship order, as here, when fit parents seek to terminate the guardianship, guardians bear the burden of demonstrating by a preponderance of the evidence that termination of the guardianship is not in the best interests of the child. Accordingly, we reverse the judgment of the court of appeals.

A.

Colorado's Guardianship Laws
In Colorado, there are several statutory options for the immediate creation of a guardianship, or guardianship-like arrangement, for a minor child. First, through a power of attorney a parent may delegate to another person any power regarding the care of the child. § 15-14-105, C.R.S. (2010). A power of attorney is only available for twelve months, but may be renewed. Id. Parents may revoke the power of attorney at any time.
Second, a court may appoint a guardian pursuant to section 15-14-204. A guardianship of unlimited duration may be created under this statute if
(2) The court finds the appointment of the guardian is in the minor's best interest, and:
(a) the parents consent;

(b) all parental rights have been terminated;
(c) the parents are unwilling or unable to exercise their parental rights; or
(d) [the appointed guardian has died without leaving a successor].
§ 15-14-204(2)(a)-(d) (emphasis added). In the case before us, we address guardianship by parental consent arising under section 15-14-204(2)(a).
If necessary, and upon showing that an "immediate need exists," a court may appoint a temporary guardian. § 15-14-204(4). A temporary guardian has the authority of a permanent guardian but the duration of a temporary guardianship may not exceed six months. Id. This statute also authorizes the appointment of an emergency guardian if *780 following the regular guardianship procedures would likely result in "substantial harm to a minor's health or safety and . . . no other person appears to have authority to act in the circumstances." § 15-14-204(5). An emergency guardian may exercise only the powers specified in the order of appointment, and the duration of the appointment may not exceed sixty days. Id.
Once appointed, a guardian has the duties, responsibilities, and powers of a parent regarding the ward's support, care, education, health, and welfare, unless otherwise limited by the court. §§ 15-14-207, 208, C.R.S. (2010). Section 15-14-206(2), C.R.S. (2010), allows the court to limit the powers of the guardian at the time of appointment or later in order to develop the "self-reliance of a ward or for other good cause." In order to fulfill the duties and responsibilities of a parent towards the child, a guardian must act in the child's best interests and "exercise reasonable care, diligence, and prudence." However, unlike a parent, the guardian is entitled to reasonable compensation for services and to reimbursement for room and board. § 15-14-209(1), C.R.S. (2010). A guardianship may terminate "upon the minor's death, adoption, emancipation, or attainment of majority or as ordered by the court." § 15-14-210(1), C.R.S. (2010). A court, in turn, may issue any order that "is in the best interest of the ward." Id.
Guardianships of minor children are formed for a variety of reasons. A guardianship may arise if all parental rights have been terminated, or if a parent is unwilling or unable to exercise their parental rights. § 15-14-204(2)(b)-(c). A guardianship by parental consent under section 15-14-204(2)(a) may be established due to parental illness or incapacity, or during periods of unemployment or other times of family transition or difficulty. Guardianships in these situations give parents an opportunity to relieve themselves of the burdens involved in raising a child, thereby enabling parents to take those steps necessary to better their situation so they can resume custody of their child in the future. See, e.g., In re Guardianship of D.J., 268 Neb. 239, 682 N.W.2d 238, 246 (2004).
Consenting to a guardianship under section 15-14-204(2)(a) demonstrates parental concern for the care and well-being of the child and allows parents to provide benefits to the child that they could not presently offer themselves. Consenting to a guardianship also benefits the state; social service resources need not be devoted to investigating or litigating whether there is a need to protect a child whose parents have not taken voluntary steps to arrange for care. See Children's Code, Dependency and Neglect, §§ 19-3-101 et seq., C.R.S. (2010); see also L.L. v. People, 10 P.3d 1271, 1275 (Colo.2000) (outlining the procedures whereby the state can intercede to protect the health, safety, and welfare of minors from abuse, neglect, or abandonment).

B.

Parents' Fundamental Liberty Interest
Parents have a fundamental liberty interest in the care, custody, and control of their children. Troxel, 530 U.S. at 65, 120 S.Ct. 2054; Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Pierce v. Society of Sisters, 268 U.S. 510, 534-35, 45 S.Ct. 571, 69 L.Ed. 1070; Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). This relationship is "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme Court]." Troxel, 530 U.S. at 65, 120 S.Ct. 2054.
In Troxel, the Supreme Court struck down a Washington statute that allowed visitation by third parties whenever such visitation might serve the best interests of the children. Id. at 67, 120 S.Ct. 2054.[3] The court *781 found this statute "breathtakingly broad." Id. It held that the statute unconstitutionally infringed on the protected liberty interest of parents in the care, custody, and control of their children by permitting a court to disregard or override a parent's wishes based solely on the trial judge's personal view of the children's best interests. Id. The court observed that a fit parent is presumed to act and make decisions in the best interests of the child. Id. at 68, 120 S.Ct. 2054. A trial court must therefore "accord at least some special weight to the parent's own determination" when a parent's decision becomes subject to judicial review. Id. at 70, 120 S.Ct. 2054.
The Supreme Court left to each state to determine how to accord "special weight" to parental determinations in the context of non-parent visitation orders. In the case of In re Adoption of C.A. we enunciated a standard by which the presumption in favor of the parental visitation determination can be overcome only by clear and convincing evidence that the parental visitation determination is not in the child's best interest. 137 P.3d at 319. The trial court must give "special weight" to the parent's determination. We have recently applied this standard in In re B.J., 242 P.3d at 1130.
B.J. involved a custody dispute between a parent and non-parents. Id. The trial court granted parenting time to the non-parents over the objection of the parent, without affording the parent the presumption that his determinations were in the child's best interests. Id. at 1131. We held that the constitutional presumption that a fit parent acts in the best interests of the child applies to all stages of a custody proceeding and can be overcome only if the non-parents show by clear and convincing evidence that the parental determination is not in the best interest of the child. Id. at 1132.
Troxel, C.A., and B.J. concern judicial interference in the day-to-day child-rearing decisions of fit, custodial parents. Troxel, 530 U.S. at 71, 120 S.Ct. 2054; C.A., 137 P.3d at 319; B.J., 242 P.3d at 1131. In the case before us, the court of appeals held inapplicable the constitutional presumption articulated in Troxel because the parents no longer had custody of their child. In so finding, the court of appeals relied on In re M.J.K., 200 P.3d 1106, 1111 (Colo.App.2008), a case in which another division of the court of appeals held that parents who voluntarily give up their day-to-day parental relationship through guardianship proceedings are not entitled to the constitutional protection afforded parents acting in that role. Instead, the court of appeals determined that the best interests of the child standard applied without regard to any parental presumption. Id. at 1112.
The court of appeals in M.J.K., in turn, leaned heavily on the California case In re Guardianship of L.V., 136 Cal.App.4th 481, 38 Cal.Rptr.3d 894, 904 (2006). In L.V., parents seeking to end a guardianship by parental consent asserted their right to automatically terminate the guardianship. Id. The California court of appeals disagreed, and held that once parents give up custody of their child they no longer hold the constitutional presumption that their decisions are in the child's best interests. Id.
We disagree that the fundamental liberty interest recognized in Troxel and its progeny are inapplicable when parents seek to terminate a guardianship established by their consent. The U.S. Supreme Court recognizes the due process rights of parents to the custody of their child even if parents have not been "model parents or have lost temporary custody of their child." Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). While the "mere existence of a biological link does not merit equivalent constitutional protection," it does not follow that a decision to place a child under the care of a third party, for purposes of furthering the child's best interests, results in the relinquishment of a parent's liberty interest in the care, custody and control of the child. Lehr v. Robertson, 463 U.S. 248, 261, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). When familial bonds are weakened *782 through loss of custody, either via guardianship or other arrangement, parents must be provided fundamentally fair procedures in order to prevent the "irretrievable destruction of their family life." Id.; Santosky v. Kramer, 455 U.S. at 753, 102 S.Ct. 1388. Our decisions accord.
In In re Custody of C.C.R.S., 892 P.2d 246, 248-49 (Colo.1995), the biological mother signed a release granting custody of her child to a third party for purposes of adoption. The mother then filed a renunciation of the custody agreement with the court and requested that the child be returned to her. Id. at 249. Acknowledging mother's fitness as a parent, we determined that, despite the non-custodial nature of the mother's relationship to her child, courts must presume her decision to terminate the custody agreement to be in the child's best interests. Id. at 256. Ultimately, the presumption that a parent has a first and prior right to custody may be rebutted by evidence establishing that the best interests of the child are better served by granting custody to a non-parent. Id.
In Wilson v. Mitchell, 48 Colo. 454, 111 P. 21 (1910), a mother petitioned for custody of her child who had been residing with his paternal grandparents for several years. While the child desired to remain with his grandparents, and the grandparents were able and willing to support and educate the child, the court held the mother had a right to custody absent circumstances that would render such custody contrary to the best interests of the child. 48 Colo. at 466, 111 P. at 26. We found the evidence insufficient to overcome the presumption that the child's interests would be best served in the care and custody of his mother. 48 Colo. at 476, 111 P. at 29. Thus, while recognizing the best interests of the child test in determining custody, we accepted that a parent has a right to make custodial decisions concerning his or her child. We presume such decisions to be in the child's best interests, absent evidence to the contrary. Like C.C.R.S., the Wilson case did not consider the appropriate standard of proof.
While the parents in C.C.R.S. and Wilson did not have custody of their child, and had effectively ceded their day-to-day child rearing responsibilities to third parties, they nonetheless maintained the presumption that the child's best interests would be served under their custody. This presumption could be overcome with evidence establishing that the best interests of the child are better served by granting custody to a non-parent. See also Abrams v. Connolly, 781 P.2d 651 (Colo.1989) (concluding presumption exists that a parent has a first and prior right to custody of child, but presumption may be rebutted by evidence that the welfare of child would be promoted by awarding custody to a non-parent); Coulter v. Coulter, 141 Colo. 237, 347 P.2d 492 (1959) (concluding parent holds a preference in custody cases but does not obtain custody unless it serves the best interests of the child).

C.

Reconciling Colorado's Guardianship Laws with Parents' Fundamental Interest in the Custody of their Child
In construing a statute involving the best interests of the child, our objective is to interpret the statute in a manner consistent with its plain language while avoiding constitutional infirmity. C.A., 137 P.3d at 326. We may look to our precedent and the instructive decisions of other jurisdictions in interpreting the statute and making our decision. In re Marriage of Ciesluk, 113 P.3d 135, 142 (Colo.2005).
In Ciesluk, we addressed the interplay between the constitutional rights of parents and the best interests of the child standard. Id. We expressly rejected approaches adopted in other jurisdictions which elevated the child's welfare to a compelling state interest, thereby eliminating the need to balance the parent's competing constitutional rights. Id. at 145. Instead, while what is in the best interests of the child is the primary inquiry, this does not "automatically overcome the constitutional interest of the parents." Id. at 147; see also In re M.G., 58 P.3d 1145, 1147 (Colo.App.2002) (holding that the presumption giving custodial preference to parents does not extend to legal guardians).
Fit parents who enter into a guardianship by consent under section 15-14-204(2)(a) *783 are making a custody decision that is presumed to be in the child's best interests. Troxel, 530 U.S. at 68, 120 S.Ct. 2054 (presumption that fit parents act in the best interests of their children). During the existence of the guardianship, the guardian has the responsibilities, duties, and powers of a parent, and must act accordingly, subject to whatever limitations the court's order may impose upon the guardian. See §§ 15-14-206, 208 (a court may limit a guardian's powers, which include those of a parent regarding the child's "support, care, education, health, and welfare").
Thus, a guardianship by parental consent under section 15-14-204(2)(a) functions as a delegation of care, custody and control of the child by the parents to the guardian under the terms of the guardianship order. The parents' authority over day-to-day decisions affecting the child is suspended in favor of the guardian's decisions. The parents may not interfere with the guardian's decisions authorized under the guardianship order; if this were not so, the child would be faced with conflicting decisions inconsistent with the delegation of custody the parents have consented to. See Thomas A. Jacobs, 2 Children and the Law: Rights and Obligations § 7:24 (2009) ("If the guardian is not a parent, once the guardian is appointed and obtains custody of the minor, the parents no longer have responsibility for the child's day-to-day care.").
However, the parents are entitled to file with the court a petition for termination of the guardianship, section 15-14-210(2), and when they do so they are entitled to a presumption that their decision to reassert care, custody and control of the child is in the best interests of the child, unless the guardianship order expressly limits the parents from asserting this presumption. See C.C.R.S., 892 P.2d at 256 (in a custody dispute between a non-custodial parent and custodial non-parent, parent has a first and prior right to custody); Troxel, 530 U.S. at 72-73, 120 S.Ct. 2054 ("the Due Process clause does not permit a State to infringe on the fundamental right of parents to make childrearing decisions simply because a state judge believes a `better' decision could be made").
An important characteristic of a guardianship by parental consent is that parents have exercised their fundamental right to place their child in the custody of another for purposes of furthering the child's best interests. See § 15-14-204(2)(a). Failure to accord fit parents a presumption in favor of their decision to terminate a guardianship established by parental consent would penalize their initial decision to establish the guardianship and deter parents from invoking the guardianship laws as a means to care for the child while they address significant problems that could impair the parent-child relationship or the child's development.
Guardianships established by parental consent differ from guardianships where the state acts to impose a guardianship in the best interests of the child; for example, when the child is being neglected or abused. In such situations, which are addressed by section 15-14-204(2)(b)-(c) of the statute, the decision to initiate guardianship is not with the parents. See, e.g., L.L. v. People, 10 P.3d at 1271. Consequently, under those statutory provisions, the parents may not, in seeking to terminate the guardianship, assert the presumption that the child's best interests are served by termination of the guardianship.
Other jurisdictions have addressed the question of whether parents relinquish their fundamental liberty interest in raising their child upon consenting to a guardianship. The majority of post-Troxel cases decided by our sister states have held that parents do not give up their liberty interest by consenting to guardianship for the child.
The Nebraska Supreme Court has held that, when a parent petitions to terminate a guardianship established by parental consent, "the parental preference principle serves to establish a rebuttable presumption that the best interests of the child are served by reuniting the minor child with his or her parent." In re Guardianship of D.J., 682 N.W.2d at 246. In addition to the constitutional considerations, the court in that case focused on the implications of relying on the best interests of the child standard without a *784 parental preference principle. "Taken to its logical conclusion, [the best interests of the child standard] would place all but the `worthiest' members of society in jeopardy of a custody challenge. Moreover, by establishing a presumption in favor of parental custody, the judiciary's ability to engage in social engineering is dramatically restricted." Id. at 247 (citations omitted).
The Vermont Supreme Court has held that a parent who seeks to revoke a voluntary guardianship enjoys a presumption that his or her custody is in the child's best interests. Boisvert v. Harrington, 173 Vt. 285, 796 A.2d 1102, 1108 (2002). The Supreme Court of Michigan likewise recognizes the parental preference principle in a voluntary guardianship situation, finding that "[c]ustody cases involving natural parents inherently implicate the parents' fundamental liberty interest in the care, custody, and management of their children." Hunter v. Hunter, 484 Mich. 247, 771 N.W.2d 694, 704 (2009).
The majority trend is evident in additional cases. See In re Guardianship of Barros, 701 N.W.2d 402, 409 (N.D.2005) (once the parent proved that the impediments which initially led to the guardianship had been removed, the burden shifts to the guardians to prove the continuation of the guardianship was in the child's best interests); In re Guardianship of Blair, 662 N.W.2d 371 (Iowa App.2003) (the best interests of a child are presumptively advanced by custodial placement with a parent, and the non-parent bears the burden of persuasion throughout all guardianship proceedings to rebut the presumption favoring parental custody); In re Guardianship of L.L., 745 N.E.2d 222, 230 (Ind.App.2001) ("When a parent initiates an action to obtain custody [after implementation of a voluntary guardianship], a non-parent seeking to retain custody must bear the burden of overcoming the parent's presumptively superior right to custody.").
We have found three appellate decisions entered after Troxel that support the court of appeals in the case now before us; Grant v. Martin, 757 So.2d 264, 266 (Miss.2000) (parents who voluntarily consented to guardianship following divorce proceedings forfeited right to rely on parental presumption), L.V., 38 Cal.Rptr.3d at 904 (in voluntary guardianship, parent has relinquished constitutional presumptions), and Blair v. Badenhope, 77 S.W.3d 137, 147 (Tenn.2007) (parent's voluntary consent to cede custody to a non-parent defeats ability of parent to later claim superior parental rights).
We are persuaded by the reasoning of the Michigan Supreme Court that the Troxel presumption must prevail over any competing presumption in favor of an established custodial environment, including guardianships. Hunter, 484 Mich. at 263, 771 N.W.2d at 704. There, as here, parents sought to terminate a guardianship order appointing relatives as full guardians of the children. The Michigan Court held that "Troxel explicitly requires courts to give some deference to a parent's decision to pursue custody because it is inherently central to the parent's control over his or her child." Id., 484 Mich. at 265, 771 N.W.2d at 705.

D.

Burden of Proof
Having established that fit parents are entitled to the Troxel presumption when they seek to terminate a guardianship they have established by consent under section 15-14-204(2)(a), we turn to the applicable burden of proof.
The decisions of our sister states, Michigan and North Dakota, differ in their choice of the appropriate burden of proof. Consistent with implementing the Troxel presumption, both states assign the burden of proof to the guardian to show that termination of the guardianship is not in the best interests of the child. Michigan requires the guardian to prove by clear and convincing evidence that custody by the natural parent is not in the child's best interests. Hunter, 771 N.W.2d at 704. The Michigan Supreme Court based its decision on a Michigan statutory provision that contains the clear and convincing standard. In contrast, North Dakota requires the guardians to meet a preponderance of the evidence standard. In re Guardianship of Barros, 701 N.W.2d at 402. In choosing between these two standards, we are guided by our previous decisions.
*785 C.A. and B.J. are Troxel-implementing cases where the parent had custody over the child and the non-parent was seeking visitation time. We held that the non-parent must show by clear and convincing evidence that the parental determination to deny visitation is not in the best interests of the child. C.A., 137 P.3d at 319; B.J., 242 P.3d at 1131. In contrast, a parent who establishes a guardianship under section 15-14-204(2)(a) has chosen to delegate custody to a non-parent. A guardianship established by parental consent is also markedly different from a situation in which the state seeks to terminate parental rights wherein the clear and convincing standard of proof applies. See In re A.M.D., 648 P.2d 625, 641 (Colo.1982); L.L. v. People, 10 P.3d at 1276 (reasoning that the greater the deprivation, the greater the procedural protection provided to parents).
In A.M.D. we recognized that a parent's desire for and right to the companionship, care, custody, and control of his or her child is an interest far more precious than any property right. 648 P.2d at 632 (citing Santosky, 455 U.S. at 758-59, 102 S.Ct. 1388). To extinguish that right therefore requires application of a clear and convincing standard of proof the state must bear. A.M.D., 648 P.2d at 635-36. Pre-dating Troxel, Santosky identifies the parents' constitutional rights as including "a vital interest in preventing the irretrievable destruction of their family life." 455 U.S. at 753, 102 S.Ct. 1388.
In the case now before us, the amicus brief of the Colorado Chapter of Matrimonial Lawyers points out that parents who consent to a guardianship under section 15-14-204(2)(a) typically assume that the guardianship they have voluntarily established in the best interests of their child will be revoked and the child returned to their family unit when they petition for termination of the guardianship, even though a termination proceeding, as we discuss below, does not assure this result.
The facts of this case demonstrate the accuracy of the amicus characterization of practice under section 15-14-204(2)(a). The magistrate here gave no advisement to the parents that their decision to establish the guardianship could result in the loss of the Troxel presumption. No advisement was needed because the important constitutional interest in family life identified in Santosky and preserved through the Troxel presumption is not impliedly surrendered or lost with respect to the parents' decision to seek termination of the guardianship and reunification of the family unit. In contrast, in a dependency and neglect proceeding, section 19-5-105(3), C.R.S. (2010), requires the court to advise parents of the potential loss of their important rights. Thus, the Colorado Rules of Juvenile Procedure require the court to "fully advise" the parents "as to all rights and the possible consequences of a finding that a child is dependent or neglected." C.R.J.P. 4.2(a).
We do not view the Troxel presumption as limited only to parents who uninterruptedly maintain custody of their child, nor do we read Colorado's guardianship by parental consent statute to operate, as a matter of law, to prevent parents from invoking the Troxel presumption when they seek to terminate such a guardianship. Our holding in this case does not constitute a broadening or expansion of the parents' constitutional rights. Rather, it addresses the standard of proof applicable in a proceeding affecting those rights. The appropriate standard can vary depending on the type of proceeding and potential deprivation of rights involved. See L.L. v. People, 10 P.3d at 1276.
A guardianship established by the consent of the parent does not involve termination of all parental rights. See § 15-14-210(2) (allowing a parent, as a person "interested in the welfare" of the child, to petition for modification of the guardianship order). Instead, parental rights are suspended while the guardianship is in effect. Consistent with Troxel, a decision that reiterates the parental interest the Supreme Court found so important in Santosky, fit parents have a fundamental right to the custody and control of their children and therefore enjoy a presumption that their decision to regain custody is in the best interests of the child. 530 U.S. at 69, 120 S.Ct. 2054. Yet, the guardianship was established in the best interests of the child and the court must consider the child's interests when considering termination of the guardianship. See § 15-14-210(2) *786 (any order must be in "the best interest of the ward").
We are persuaded by the North Dakota Supreme Court's reasoning that the Troxel presumption and the court's statutory role in considering what is in the child's best interests can be accommodated through the guardian bearing the burden of proof by a preponderance of the evidence. See In re Guardianship of Barros, 701 N.W.2d at 402. We hold that, in a proceeding brought by fit parents to terminate a guardianship established by consent under section 15-14-204(2)(a), guardians must demonstrate by a preponderance of the evidence that termination of the guardianship is not in the best interests of the child. This is consistent with section 13-25-127(1), C.R.S. (2010), which applies a preponderance standard when the degree of proof is not otherwise specified. Our holding in this case recognizes that non-custodial parents seeking to terminate a guardianship are not in the same position as the custodial parents in C.A. and B.J.

E.

Application to This Case
Here, the parents consented to a guardianship of their child under section 15-14-204(2)(a) because they determined that their child's best interests would be served by living in a stable household with relatives while the parents sought help for mother's health problems. There was no adjudication in this case that both parents were unfit. The state did not initiate this guardianship; the parents did. When mother's health issues resolved and parents decided that their child's best interests would be served by reuniting in their home in Massachusetts, they sought to terminate the guardianship.
In entering the guardianship order in this case under section 15-14-204(2)(a) ("The court may appoint a guardian for a minor if the court finds the appointment is in the minor's best interest and the parents consent"), the Magistrate emphasized the consensual nature of this guardianship. If the parents withdrew their consent, they could regain the custody they had voluntarily suspended, a decision they were making in the best interests of their child, at such time as they might in the future seek to terminate the guardianship:
THE COURT: Guardianships are generallythere are a few wrinkles, but generally they are consensual in nature, and if at some point in the future, you, number one withdraw your consent for the guardianship because you now think it's better for (D.I.S.) to come back with you and Sheryl, or just you as the situation could be, and assuming you are able and willing to take care of (D.I.S.) (inaudible) circumstances allow you to do that, then by definition of our statutes, physical guardianship will cease to exist.
Unfortunately, the Magistrate misled the parents in suggesting that the guardianship would "cease to exist" if parents' withdrew their consent. The Troxel presumption in their favor operates only to place the burden of proof on the guardians in the termination proceeding. It does not guarantee that custody will be restored to the parents.
In the hearing on the motion to terminate the guardianship, the trial court found that mother's health issues which led to their consent to the guardianship had been resolved. The trial court nonetheless placed the burden of proof on the parents to prove by a preponderance of the evidence that termination of the consensual guardianship would be in the best interests of their child.
We conclude that neither the trial court nor the court of appeals applied the proper standard in determining whether to terminate this consensual guardianship. We agree with the parents that their decision to place the child into a guardianship arrangement with their non-parent relatives under section 15-14-204(2)(a), so that mother could address significant health issues affecting their ability to care for the child, is entitled to the constitutional presumption that they made this decision in the best interests of the child. We find no language in this or any other section of the statute, or in our case law, supporting an interpretation that the General Assembly intended to bar the parents from asserting this same presumption when they sought termination of the guardianship *787 they established in accordance with the statute.
However, parents did delegate custody of the child for an unlimited period and the guardianship order places only one limitation on the decision-making authority of the guardians (guardians must consult with father on major decisions). Thus, until the guardianship order is terminated or modified, parents may not interfere with the guardians' day-to-day decisions. The guardians could have refused to accept the guardianship unless the parents agreed to a limitation in the guardianship order preventing parents from invoking the constitutional presumption that termination of the guardianship is in the best interests of the child, but the guardianship order in this case contains no such limitation.
Accordingly, in this termination of guardianship proceeding, the trial court must give "special weight" to the parents' decision to terminate the guardianship, and the non-parent guardians have the burden to show by a preponderance of the evidence that terminating the guardianship is not in the best interests of the child. Troxel, 530 U.S. at 65, 120 S.Ct. 2054; C.A., 137 P.3d at 319; B.J., 242 P.3d at 1129. This accords with Colorado's longstanding history of affording respect to parental authority while consistently recognizing that the best interests of the child must be taken into account. C.C.R.S., 892 P.2d at 256; Coulter, 141 Colo. at 241, 347 P.2d at 494; Wilson, 48 Colo. at 468, 111 P. at 26.
Failure to accord the parents a presumption in favor of their decision to terminate the guardianship would penalize their initial decision that it was in the best interest of the child to enter into a consensual guardianship relationship with the non-parent relatives under section 15-14-204(2)(a). An inquiry that focuses solely on the best interest of the child creates the possibility that the desires of fit and suitable parents may lose out to guardians who are able to provide the child a nicer home, a better school district, or more extracurricular activities. The legislature did not intend to foster a system in which "the poor should beget the children and the rich should rear them." Wilson, 48 Colo. at 468, 111 P. at 26.
There would be a chilling effect on parental willingness to give consent to a guardianship under section 15-14-204(2)(a)even when circumstances dictate that it would be in the best interests of the childif fit parents' interests are not appropriately recognized and protected when they seek to terminate the consensual guardianship. Few parents are likely to enter into a consensual guardianship designed to care for their child while they are experiencing and addressing significant problems that threaten the parent-child relationship if, by doing so, they must surrender their liberty interest in the care, custody and control of their child.
This is not to say that parents who petition for termination of a guardianship will automatically regain custody of the child; the longer the child resides with and is cared for by guardians, the more likely it may be that guardians, despite the presumption in parents' favor, will be able to show by a preponderance of evidence that the best interests of the child are served by continuation of the guardianship.

III.
Accordingly, we reverse the judgment of the court of appeals and remand this case with directions that it be returned to the district court for further proceedings consistent with this opinion.
Justice MARTINEZ dissents, and Chief Justice BENDER and Justice COATS join in the dissent.
Justice MARTINEZ, dissenting.
The majority's holding, that in creating a guardianship through consent parents do not relinquish their right under Troxel to the presumption that they are acting in the best interests of their child when they move to terminate a guardianship, conceals a more accurate holding: that Colorado's unlimited-guardianship statute is a constitutional violation of the substantive due-process right in Troxel, requiring the statute to be rewritten to prevent parents from too easily suspending a future right to a presumption that their *788 desire to terminate the guardianship is in the best interests of their child.
As Colorado's unlimited-guardianship statute is written, all parental rights relating to the ward's support, care, education, health, and welfarewhich would include the right to any presumption upon moving to terminate the guardianshipare suspended in an unlimited guardianship, unless parents have specifically retained rights by forming a limited guardianship. But under the majority's revision, even when forming an unlimited guardianship, parents now retain the right to a presumption that, upon moving to terminate the guardianship, they act in the best interests of their child, unless they specifically disclaim that right.
The majority's justification for rewriting Colorado's unlimited-guardianship statute rests entirely on the propriety of expanding the right in Troxel to the circumstances of this case, which the majority is only able to do by misapprehending what, under Troxel, constitutes a "fit" parent entitled to presumptive rights. Fit parents are not, contrary to the majority's narrow view, merely those who have never been adjudicated "unfit." Under Troxel, fit parents are custodial parents, with intact parental rights, actively raising their children. Hence, the parents in this case, their legal rights suspended by an unlimited guardianship, possessing neither custody nor control of their child, and not having been actively raising their son for close to a decade, are not fit parents entitled to a Troxel right.
Before analyzing how the majority has improperly expanded Troxel, I focus on two preliminary matters: first, I consider the facts of this case, which the majority has presented in a one-sided manner that improperly, and unnecessarily, invokes sympathy for the parents, lending emotional support for an expansion of Troxel. Second, I consider Colorado's carefully-structured guardianship laws, which, though ignored by the majority, give parents ample opportunities to preserve their parental rights.

I. Facts
The majority's presentation of the facts is incomplete and replete with judgments concerning the guardians, which arouse a heightened sympathy for the parents that more easily lends support to an expansion of the right in Troxel. After taking a more balanced look at the facts, however, this heightened sympathy is not warranted, and should not provide a basis for rewriting Colorado's guardianship laws.
The majority glosses over the primary reason why the parents established the guardianship: because of mother's serious mental-health problems, they were not fit to take care of their son. At the guardianship-appointment hearing, father testified that although his wife loved her son, she "can't take care of him." Father also testified that between trying to raise his son, hold down a full-time job, and take care of his wife and manage her illness, "it just became too much for" him. This situation gave rise to the need for the guardianship. As one of the guardians testified, "prior to coming out here, [D.I.S.] was in an environment where he was basically cycling between two sets of grandparents, and occasionally seeing [his father]. It wasn't a situation that provided a constant kind of environment that I think a young child like that needs for bonding." Because of mental-health issues, the parents were not adequately caring for their child, creating the need for guardianship.
The majority accuses the trial court of misleading the parents by telling father that if they withdrew their consent to the guardianship, "physical guardianship will cease to exist." Maj. op. at 786. Whatever the trial court may have meant by "physical guardianship," this exchange must be read in the context of the entire hearing. Multiple times, the trial court explained to father that if his or his wife's situation changed and they wanted to review, change, or terminate the guardianship, they would only have an "opportunity" for the court to review their request and make a decision. The attorney representing the guardians informed the trial court that he spoke to father "and explained to him that the older the child gets the harder it is to ever reunify." And at the guardian-appointment hearing, one of the guardians testified that "the real intent [of the parties in bringing D.I.S. to Colorado] *789 was to have him here on an indefinite basis," and that a guardianship would foster greater stability in D.I.S.'s life.[1]
The majority accuses the guardians of refusing to travel to Massachusetts with D.I.S., not allowing D.I.S. to spend the night with his parents, and frustrating the parents' efforts to spend time with their son, all of which suggest that the guardians systematically deprived the parents of bonding time with their child. Maj. op. at 778. To the contrary, the trial court found that there was "insufficient evidence of a pattern of alienation against the biological parents by the guardians." Further, the record shows that the guardians have never foreclosed the possibility of reunifying D.I.S. with his parents. The guardians requested a parenting coordinator to arrange visits and solve disputes, and wanted D.I.S. to "develop a deeper relationship with [his parents]."
And finally, the majority downplays the deep bonds that formed between D.I.S. and his guardians, as well as the non-existence of those bonds between D.I.S. and his parents. The guardians became D.I.S.'s substitute parents, fully integrating him into their lives, making every major and most day-to-day decisions for him for the last decade. As one guardian testified at the guardianship-termination hearing, when they first brought D.I.S. into their home, she had to "let go of other things in my life so I could concentrate" on making sure that "all of D.I.S.'s needs [were] met by primarily a single caregiver." According to the child and family investigator (CFI) report, D.I.S. came to view his relationships with his guardians "as the rock and foundation of his world."
In contrast, the trial court found that the "[b]iological parents have not been consistently child-centered." "The interrelationship between the minor child and biological mother, in terms of a parent/child relationship, is virtually non-existent." The trial court approvingly cited the CFI report, which said that "in terms of the relational qualities, [D.I.S.] perceives much more [the guardians] as his parental figures."
The state of these relationships only confirms the strong likelihood that in opposing the motion to terminate the guardianship, the guardians were acting pursuant to their statutory mandate to "act at all times in the ward's best interest." § 15-14-207(1), C.R.S. (2010). As one of the guardians testified, "I would not be comfortable with a transition until the point at which [D.I.S.] felt that [his biological parents] were also his psychological parents." The trial court, and the CFI, both agreed.

II. The Unlimited Guardianship
In a paragraph loosely describing the rights and obligations of guardians, the majority buries the primary vehicle by which parents are free to safeguard their rights under Colorado's guardianship laws: the limited guardianship. § 15-14-206(2); maj. op. at 780. The majority never calls the limited guardianship by its proper, statutory name. Nor does the majority use the proper, statutory name to describe the main alternative to a limited guardianship: the unlimited guardianship. But that is what the statutory scheme, Colorado's adoption of the 1997 Uniform Guardianship and Protective Proceedings Act,[2] properly calls them.[3]
*790 The terminology is important because it focuses attention on the differing rights and obligations parents and guardians have depending on the guardianship arrangement formed. Under Colorado law, an unlimited guardianship, as its name suggests, grants guardians the full range of powers and responsibilities available through statute, which, considerably, encompass all matters "regarding the ward's support, care, education, health, and welfare." §§ 15-14-207 to -208. In an unlimited guardianship, except for those rights and obligations spelled out by statute, parents retain no authority over their children; all parental rights regarding the ward's support, care, education, health, and welfare are suspended.[4] That is why Colorado's guardianship law is designed so that an unlimited guardianship is the option of last resort, with many other guardian or guardianship-like arrangements available to parents, the principal option being the limited guardianship.[5] And the reason the majority hesitates, and declines, to call the unlimited guardianship by its proper name is because terminating a guardianship most certainly falls within the ambit of the ward's support, care, education, health, and welfare; hence, suspended by an unlimited guardianship is the presumption that, upon moving to terminate the guardianship, the parents are acting in the best interests of the child.
But under Colorado law, parents are never forced to choose between an unlimited guardianship or no guardianship at all; they are free to form limited guardianships. Under section 15-14-206(2), "the court may limit the powers of a guardian" otherwise granted by Colorado's guardianship law, "and thereby create a limited guardianship." The power to create limited guardianships is extremely flexible, as the limitation must only be "[i]n the best interest of developing self-reliance of a ward or for other good cause." Id. If a limited guardianship is formed, then those limitations should be specifically enumerated by the trial court in its written order, and those limitations must be endorsed on the guardian's letters. § 15-14-110(3). But when parents do not limit a guardian's power, their rights are suspended and not retained.
Thus, as written, Colorado's guardianship law takes into account the vast array of circumstances that may call for a guardianship, and gives parents and guardians tremendous flexibility in crafting the guardianship that suits their particular situations. If the parents in this case had wanted to keep a thumb on the scale when terminating the guardianship, they could readily have done so by creating a limited guardianship where they reserved the presumption that, upon moving to terminate the guardianship, they *791 act in the best interests of their child. They did not do so.

III. Expansion of Troxel

The majority's motivation for rewriting Colorado's guardianship law lies in its determination that the parents here have a constitutional right that, upon moving to terminate the unlimited guardianship, they are entitled to a presumption that they are acting in the best interests of their child. The Supreme Court has recognized that when fit, custodial parents disagree with grandparents over a visitation dispute, the parents are entitled to a presumption that their visitation decision is in the best interests of the child. Troxel v. Granville, 530 U.S. 57, 68-69, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Further, we have applied Troxel by recognizing that fit, custodial parents are entitled to a presumption that they act in the best interests of their child when they make visitation decisions conflicting with the wishes of non-parents. In re B.J., 242 P.3d 1128, 1134 (Colo.2010). But we have never expanded the rights recognized in Troxel and B.J. beyond their moorings in fit, custodial parents with intact parental rights.
The majority's claim that the parents in this case were fit when they established the guardianship, and will be fit when they move to terminate it, can only be made by misreading Troxel, conceiving Troxel's parental-fitness requirement narrowly, disassociating it from custody and intact parental rights. The majority views a Troxel fitness determination as simply a question of whether there has been an adjudication finding parents "unfit." See maj. op. at 786.
But the plurality in Troxel does not conceive of parental fitness so narrowly. Broadly, the Troxel plurality equates parental fitness with a parent "adequately car[ing] for his or her children." 530 U.S. at 68, 120 S.Ct. 2054. This equation presumes some level of parental custody and control. Further, in "elaborat[ing] with care" the substantive due-process right in Troxel, id. at 73, 120 S.Ct. 2054, the plurality relied on cases that only recognized "the due process right of parents to make critical decisions about the upbringing of their children," McCurdy v. Dodd, 352 F.3d 820, 826-27 (3d Cir.2003).[6] Hence, critically, the parent's presumptive right in Troxel was part and parcel of that parent's right, as a fit, custodial parent, with fully intact legal rights, "to make decisions concerning the rearing of her two daughters." 530 U.S. at 70, 120 S.Ct. 2054. So, although a parent whose rights have been terminated would no longer be "adequately caring for his or her children," so too might parents who no longer have intact legal custody and control of their children.
Supreme Court precedent confirms that parental fitness under Troxel must not be divorced from some degree of legal and physical custody. The Court "has noted that the rights of the parents are a counterpart of the responsibilities they have assumed," and that a parent's liberty interests "`do not spring full-blown from the biological connection between parent and child. They require relationships more enduring.'" Lehr v. Robertson, 463 U.S. 248, 257, 260, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (quoting Caban v. Mohammed, 441 U.S. 380, 397, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979)). Further, it is those "who nurture [a child] and direct [his or her] destiny [who] have the right, coupled with the high duty, to recognize and prepare [him or her] for additional obligations." Pierce, 268 U.S. 510, 535, 45 S.Ct. 571 (1925), quoted in Troxel, 530 U.S. at 79, 120 S.Ct. 2054 (Souter, J., concurring in the judgment); see also Smith v. Org. of Foster Families for Equality & Reform, 431 U.S. 816, 844, 97 S.Ct. 2094, 53 L.Ed.2d 14 (describing that the importance of family relationships springs not only from relation by blood, but from "the emotional attachments that derive from the intimacy of daily association"). In short, it is legal custody and control that *792 gives parental wishes presumptive effect under Troxel.
Granted, the Court has not "set out exact metes and bounds to the protected interest of a parent in the relationship with his child," Troxel, 530 U.S. at 78, 120 S.Ct. 2054 (Souter, J., concurring), which includes the exact contours of parental fitness under Troxel.[7] But so long as parental fitness involves some level of custody, control, and intact legal rights, the parents in this case do not qualify as fit under Troxel.
The majority assumes that, under Troxel, the parents were fit when they consented to the guardianship. To the contrary, the facts show that they were not, in Troxel's words, "adequately caring" for their son. The majority also assumes that, absent an adjudication of unfitness, the parents are fit for purposes of Troxel when they move to terminate the guardianship.
To the contrary, even assuming that the parents were fit when they created the guardianship, when moving to terminate the guardianship, the parents are in an entirely different place under the Constitution as far as fitness is concerned. By consenting to an unlimited guardianship, the parents have relinquished their liberty interest in the care, custody and control of their child. For the last decade, D.I.S.'s parents have not had physical custody of their son. For most of that time, their legal rights over their son have not been intact. In fact, every right relating to their son's "support, care, education, health, and welfare" has been suspended. They have not been active in bringing up their son; since the guardianship was formed, they have made no major and few, if any, day-to-day rearing decisions. Hence, based on a parental-fitness requirement connected to physical custody and intact legal rights, the parents are not entitled to any presumption that, upon moving to terminate the guardianship, they are acting in the best interests of their child.
In expanding Troxel to situations where the parents have no legal custody, control, or intact legal rights, the majority has thrown Colorado's guardianship law into confusion. Before today, when parents and guardians consented to an unlimited guardianship, statute clearly specified their rights and obligations. But now, by only stating that parents "may not interfere with the guardian's day-to-day decision making," maj. op. at 779, and by recognizing that, despite the existence of an unlimited guardianship, parents do not lose their fundamental liberty interest in the care, custody, and control of their children, maj. op at 781, the majority has opened the door to a host of major, child-rearing decisions unlimited guardians may no longer have the authority to make if challenged by parents. We do not know, for example, whether, despite consenting to an unlimited guardianship, parents retain a constitutional right to determine weighty matters like religious upbringing and significant health or educational choices.
Yet another aspect of Troxel that counsels against its expansion is that its holding was based on a "combination of factors," one of which was a "breathtakingly broad" statute that gave fit, custodial parents no deference over visitation matters. 530 U.S. at 67, 72, 120 S.Ct. 2054. In contrast, the statutes regulating Colorado's guardianship law are not overly broad; indeed, the statutory scheme gives parents unparalleled opportunities to preserve their rights through limited guardianships. And even where parents elect not to limit guardians' powers at the time of the guardianship, they retain significant residual powers.[8]
*793 The cases that the majority cites in support of its expansion of Troxel are unpersuasive. The Colorado cases that the majority relies on for expanding Troxel, In re Custody of C.C.R.S., 892 P.2d 246 (Colo.1995), and Wilson v. Mitchell, 48 Colo. 454, 111 P. 21 (1910), are inapposite. In both cases, the parents had never lost legal custody of their children, even if they did not always have physical custody. C.C.R.S., 892 P.2d at 255; Wilson, 48 Colo. at 475, 111 P. at 28-29. In sharp contrast, both parents here suspended their rights pursuant to a statutory scheme. Further, C.C.R.S. does not stand for the broad proposition that when parents do not have custody of their children, courts must presume that parents' attempts to regain custody are in the best interests of their child. See maj. op. at 782. Rather, C.C.R.S. only recognized that a parent is entitled to a presumption that her effort to regain custody is in the best interests of the child where the parent and prospective adoptive parents entered into an unenforceable custody agreement the parent revoked six months after her child's birthwhen the child was still an infantand where the prospective adoptive parents sought full legal and physical custody of the child. 892 P.2d at 249 n. 5, 250, 255. The unique circumstances in C.C.R.S. do not apply here.
The majority also supports expanding Troxel by claiming that a majority of jurisdictions have done so. But it is far from clear that, among a majority of jurisdictions, parents are always entitled, as a matter of right, to a presumption that their motions to terminate guardianships are in the best interests of their children.
For example, the majority incorrectly relies on Hunter v. Hunter, 484 Mich. 247, 771 N.W.2d 694 (2009) to support the proposition that "the Troxel presumption must prevail over any competing presumption in favor of an established custodial environment," including guardianships. Maj. op. at 784. In Hunter, two statutes irreconcilably conflicted over the correct burden of proof in awarding custody in a dispute between a natural parent and a non-parent in an established custodial setting. 771 N.W.2d at 702-03. The court in Hunter used Troxel to decide that the statute that gave some deference to a parent controlled. Id. at 705, 710. In its analysis, the Hunter court specially acknowledged that Troxel only required a presumption in favor of fit custodial parents. Id. at 707. Further, the court found itself in accord with "many courts [that] have distinguished Troxel because it `was concerned with judicial interference in the day-to-day child-rearing decisions of fit, custodial parents. . . . It did not address situations in which the parent no longer has custody.'" Id. at 707 n. 39 (quoting In re MJK, 200 P.3d 1106, 1109 (Colo.App.2008)).
The majority also cites Boisvert v. Harrington, 173 Vt. 285, 796 A.2d 1102, 1108 (2002), in support of its position. Maj. op. at 784. But Boisvert's holding only applies to minor guardianships created through section 2645 of the Vermont Statutes Annotated, title 14 (2010); Vermont also allows parents to consent to the creation of a permanent guardianship, under which parents do not possess a constitutional presumption upon a motion to terminate. Vt. Stat. Ann. tit. 14, §§ 2661, 2664, 2666 (2010). Similarly, the majority's citation to In re Guardianship of Blair, 662 N.W.2d 371, 2003 WL 182981, at *5 (Iowa Ct.App.2003) (unpublished decision), is unpersuasive, because in Iowa, the legislature has expressed a preference that "the parents of a minor child, or either of them, if qualified and suitable, shall be preferred over all others for appointment as guardian." Iowa Code § 633.559 (2010); see also In re Guardianship of Hedin, 528 N.W.2d 567, 581 (Iowa 1995) (extending legislative preference to termination proceedings). Our legislature has expressed no such preference.
In addition, the majority has appeared to consider only two of those states holding that where parents voluntarily relinquish custody *794 of their children to a non-parent to some degree or another, they may lose any right to a presumption that they act in the best interests of their children when they reassert custody rights. See In re Nelson B., 225 W.Va. 680, 695 S.E.2d 910, 915 (2010); Blair v. Badenhope, 77 S.W.3d 137, 147 (Tenn. 2002); Grant v. Martin, 757 So.2d 264, 266 (Miss.2000); Price v. Howard, 346 N.C. 68, 484 S.E.2d 528, 534 (1997); Shifflet v. Shifflet, 891 S.W.2d 392, 394 (Ky.1995); Ex parte McLendon, 455 So.2d 863, 865 (Ala.1984); In re Perales, 52 Ohio St.2d 89, 369 N.E.2d 1047, 1052 (1977). These cases are generally applicable to guardianship proceedings because guardians are most often entitled to custody of their wards. Clark v. Kendrick, 670 P.2d 32, 34 (Colo.App.1983).
But even if the majority were correct in its assessment of the dominant view among jurisdictions, Colorado's guardianship law allays several of the concerns motivating courts that have expanded the right. For instance, two of the cases cited by the majority express a concern that failure to recognize a parental presumption will discourage parents from entering into guardianships. In re Guardianship of Barros, 701 N.W.2d 402, 407 (N.D.2005); In re Guardianship of D.J., 268 Neb. 239, 682 N.W.2d 238, 246 (2004). But in Colorado, parents will not be dissuaded from entering into guardianships generally, as they are free to propose limited guardianships.
In another one of the cases the majority cites, the court describes a guardianship as "no more than a temporary custody arrangement established for the well-being of a child." D.J., 682 N.W.2d at 248. But this description does not square with Colorado's view of the unlimited guardianship. Finally, none of the cases cited by the majority contemplate the effectconstitutional or otherwiseof a limited-guardianship option, which serves as vehicle for preserving parental authority.
Thus, by extending the right in Troxel to parents who do not have legal or physical custody of their child, the majority has ignored Troxel's underpinnings and has significantly expanded a constitutional right.

IV. Conclusion
Based on a one-sided view of the circumstances of this case, a failure to recognize how Colorado law adequately protects parents' rights, and a misreading of parental fitness under Troxel, the majority has needlessly rewritten Colorado's guardianship laws and cast great uncertainty about what rights and powers guardians actually have in an unlimited guardianship. By disassociating parental fitness from custody and intact legal rights, the majority has greatly expanded a substantive due-process right, failing to recognize that fitness is not just a matter of whether a parent has been adjudicated "unfit." Under Troxel, fit parents are actively making child-rearing decisions in a custodial context where they have the right to do so. But the parents here are far from fit. They have neither custody nor control of their child, all their rights relating to their son's "support, care, education, health, and welfare" have been suspended, and they have not been actively raising their son for close to a decade. Under such circumstances, Troxel should not apply. Accordingly, I respectfully dissent.
I am authorized to state that Chief Justice BENDER and Justice COATS join in this dissent.
NOTES
[*] Chief Justice Bender, Justice Martinez, and Justice Coats would grant the Petition.
[1] We granted certiorari on the following issues:

(1) Whether a parent relinquishes his or her fundamental liberty interest in the care, custody, and control of his or her child by consenting to guardianship.
(2) Whether it was error to place the burden upon parents to prove, by a preponderance of the evidence, that termination of non-parents' guardianship would be in the best interests of minor child, where parents originally consented to the guardianship.
[2] Unless otherwise noted, all references to Troxel are to the plurality opinion.
[3] In Troxel, six justices agreed that the statute was unconstitutional as applied in the case, although on differing rationales. See Troxel, 530 U.S. at 75, 120 S.Ct. 2054 (plurality opinion); id. at 75, 120 S.Ct. 2054 (Souter, J., concurring in judgment); id. at 80, 120 S.Ct. 2054 (Thomas, J., concurring in judgment). The plurality in Troxel described the parental due process interest as "perhaps the oldest of the fundamental liberty interests recognized by this Court." Id. at 65, 120 S.Ct. 2054. Justices Souter, Thomas, and Kennedy recognized the parental due process interest as well, see id. at 80, 120 S.Ct. 2054 (Thomas, J., concurring in judgment), although Justice Thomas noted that "neither party has argued [in the case] that our substantive due process cases were wrongly decided." Id. Similarly here, neither party challenges the existence of the parental due process interest, but rather only its application to this case.
[1] Facts aside, the allegation that parents intended to create a less permanent guardianship than they did has not been raised before us and should not provide incentive to change Colorado's guardianship law. The magistrate's order establishing the unlimited guardianship found that the parents voluntarily and knowingly consented to such an arrangement. The validity of this order, like any other judgment, was subject to appeal under C.A.R.(a)(1), see also C.R.M. 6(e)(2)(A), 7; or post judgment attack under C.R.C.P. 60(b). But it has never been appealed or otherwise challenged. Thus, the decree awarding unlimited guardianship completely determines the rights of the parties on the sufficiency of the consent to the unlimited guardianship. See State Farm Mut. Auto. Ins. Co. v. Brekke, 105 P.3d 177, 185 (Colo. 2004) (defining final judgment). Hence, the proper consideration of this case commences and proceeds based on the fact that the parents knowingly and voluntarily consented to an unlimited guardianship.
[2] In construing this uniform act, I find the 1997 Uniform Guardianship and Protective Proceedings Act's drafting committee's comments persuasive. See In re Estate of Royal, 826 P.2d 1236, 1238 (Colo.1992) (turning to commissioners' comments to understand Colorado's enactment of the Uniform Probate Code); see also 3A Sutherland Statutory Construction, Guardianship Statutes § 69:14 (7th ed.) ("A Law Revision Commission's official comments express legislative intent . . .").
[3] See, e.g., § 15-14-204(4) (stating that a temporary guardian, unless otherwise ordered by the court, "has the authority of an unlimited guardian"); Unif. Guardianship & Protective Proceedings Act (1997) § 202, 8A ULA 301, 333 cmt. (2003) (stating that in reviewing a petition for confirmation of appointment of a standby guardian, the court must assess "the powers to be given the guardian," and "if an unlimited guardianship" is formed, "why a limited guardianship would not work"); Id. at 341 cmt. (referring to the duties and responsibilities of a guardian, regardless of "whether the guardianship of the minor ward is limited or unlimited, it is essential that the minor be involved in decision making").
[4] See In re Guardianship of Ann S., 45 Cal.4th 1110, 90 Cal.Rptr.3d 701, 202 P.3d 1089, 1098 (2009) (recognizing that once a court appoints a guardian, the authority of the parent "ceases" and parental rights are completely suspended); Conservatorship of Justin R., 662 A.2d 232, 234 (Me. 1995) (recognizing that probate court may appoint a guardian for a minor if all "parental rights of custody have been terminated or suspended"); In re Guardianship of Copenhaver, 124 Idaho 888, 865 P.2d 979, 983 (1993) (observing that whether a guardianship should exist depends, in part, on if "parental rights have been suspended by circumstances"); see also 39 Am. Jur.2d Guardian & Ward § 90 (stating that the "termination or suspension of parental rights are conditions that must be satisfied before the court may appoint a guardian for a minor").
[5] See Unif. Guardianship & Protective Proceedings Act (1997) § 206, 8A ULA 301, 339-40 cmt. (2003) (stating that "[a] court, whenever possible, should only grant to the guardian those powers actually needed"); Id. at 302, prefatory note (observing that "guardianship . . . should be view[ed] as a last resort, that limited guardianships. . . should be used whenever possible").
[6] The cases relied on are Meyer v. Nebraska, 262 U.S. 390, 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (right for a parent to establish a home and bring up children, including controlling their education); Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary, 268 U.S. 510, 534-35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (right for a parent to direct the education and upbringing of children); and Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (right for a parent to the "custody, care, and nurture of the child").
[7] The Supreme Court has neither "explained nor defined" the differences between a "fit" and an "unfit" parent. Daniel R. Victor & Keri L. Middleditch, Grandparent Visitation: A Survey of History, Jurisprudence, and Legislative Trends Across the United States in the Past Decade, 22 J. Am. Acad. Matrim. Law. 391, 392, 409 (2009) (describing the difficulty of defining an "unfit parent" in child custody cases). Further, as the Seventh Circuit has acknowledged, "[a]lthough it is well established that parents have a fundamental constitutional liberty interest in the `care, custody, and control of their children,' the appropriate framework for analyzing claims alleging a violation of this interest is less than clear." Russ v. Watts, 414 F.3d 783, 789 (7th Cir.2005) (quotation omitted).
[8] When a parent consents to an unlimited guardianship, that parent: (1) remains an interested person for purposes of petitioning the court "for any order that is in the best interest of the ward," including termination of the guardianship under section 15-14-210 and an appointment of a guardian ad litem under section 15-14-115; (2) may receive reports of the condition of the ward pursuant to section 15-14-207; and (3) may request notice before any order is made in the guardianship proceeding under section 15-14-116. Partly because of these residual powers, even though the trial court denied the motion to terminate the guardianship in this case, it still granted parents substantial visitation rights.